## NEVADA ET AL. *v.* HALL ET AL.

No. 77–1337. Argued November 7, 1978—Decided March 5, 1979

Stevens, J., delivered the opinion of the Court, in which Brennan, Stewart, White, Marshall, and Powell, JJ., joined. Blackmun, J., filed a dissenting opinion, in which Burger, C. J., and Rehnquist, J., joined, *post*, p. 427. Rehnquist, J., filed a dissenting opinion, in which Burger, C. J., joined, *post*, p. 432.

*Michael W. Dyer,* Deputy Attorney General of Nevada, argued the cause for petitioners. With him on the briefs were *Robert Frank List,* Attorney General, and *James H. Thompson,* Chief Deputy Attorney General.

*Everett P. Rowe* argued the cause and filed a brief for respondents.

Mr. Justice Stevens delivered the opinion of the Court.

In this tort action arising out of an automoble collision in California, a California court has entered a judgment against the State of Nevada that Nevada's own courts could not have entered. We granted certiorari to decide whether federal law prohibits the California courts from entering such a judgment or, indeed, from asserting any jurisdiction over another sovereign State.

The respondents are California residents. They suffered severe injuries in an automoble collision on a California highway on May 13, 1968. The driver of the other vehicle, an employee of the University of Nevada, was killed in the collision. It is conceded that he was driving a car owned by the State, that he was engaged in official business, and that the University is an instrumentality of the State itself.

Respondents filed this suit for damages in the Superior Court for the city of San Francisco, naming the administrator

of the driver's estate, the University, and the State of Nevada as defendants. Process was served on the State and the University pursuant to the provisions of the California Vehicle Code authorizing service of process on nonresident motorists.[1] The trial court granted a motion to quash service on the State, but its order was reversed on appeal. The California Supreme Court held, as a matter of California law, that the State of Nevada was amenable to suit in California courts and remanded the case for trial. *Hall* v. *University of Nevada*, 8 Cal. 3d 522, 503 P. 2d 1363. We denied certiorari. 414 U. S. 820.

On remand, Nevada filed a pretrial motion to limit the amount of damages that might be recovered. A Nevada statute places a limit of $25,000 on any award in a tort action against the State pursuant to its statutory waiver of sovereign immunity.[2] Nevada argued that the Full Faith and Credit

---

[1] Section 17451 of the Code provides:

"The acceptance by a nonresident of the rights and privileges conferred upon him by this code or any operation by himself or agent of a motor vehicle anywhere within this state, or in the event the nonresident is the owner of a motor vehicle then by the operation of the vehicle anywhere within this state by any person with his express or implied permission, is equivalent to an appointment by the nonresident of the director or his successor in office to be his true and lawful attorney upon whom may be served all lawful processes in any action or proceeding against the nonresident operator or nonresident owner growing out of any accident or collision resulting from the operation of any motor vehicle anywhere within this state by himself or agent, which appointment shall also be irrevocable and binding upon his executor or administrator." Cal. Veh. Code Ann. § 17451 (West 1971).

An administrator of the decedent's estate was appointed in California and was served personally.

[2] Nev. Rev. Stat. § 41.035 (1) as it existed in 1968, found in official edition, 1965 Nev. Stats., p. 1414 (later amended by 1968 Nev. Stats., p. 44, 1973 Nev. Stats., p. 1532, and 1977 Nev. Stats. pp. 985, 1539):

"No award for damages in an action sounding in tort brought under section 2 may exceed the sum of $25,000 to or for the benefit of any

Clause of the United States Constitution [3] required the California courts to enforce that statute. Nevada's motion was denied, and the case went to trial.

The jury concluded that the Nevada driver was negligent and awarded damages of $1,150,000.[4] The Superior Court entered judgment on the verdict and the Court of Appeal affirmed. After the California Supreme Court denied review,

claimant. No such award may include any amount as exemplary or punitive damages or as interest prior to judgment."

Nev. Rev. Stat. § 41.031 (1977):

"1. The State of Nevada hereby waives its immunity from liability and action and hereby consents to have its liability determined in accordance with the same rules of law as are applied to civil actions against natural persons and corporations, except as otherwise provided in NRS 41.032 to 41.038, inclusive, and subsection 3 of this section, if the claimant complies with the limitations of NRS 41.032 to 41.036, inclusive, or the limitations of the NRS 41.010. The State of Nevada further waives the immunity from liability and action of all political subdivisions of the state, and their liability shall be determined in the same manner, except as otherwise provided in NRS 41.032 to 41.038, inclusive, and subsection 3 of this section, if the claimant complies with the limitations of NRS 41.032 to 41.036, inclusive.

"2. An action may be brought under this section, in a court of competent jurisdiction of this state, against the State of Nevada, any agency of the state, or any political subdivision of the state. In an action against the state or any agency of the state, the State of Nevada shall be named as defendant, and the summons and a copy of the complaint shall be served upon the secretary of state."

[3] Article IV, § 1, provides:

"Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

[4] The evidence indicated that respondent John Hall, a minor at the time of the accident, sustained severe head injuries resulting in permanent brain damage which left him severely retarded and unable to care for himself, and that respondent Patricia Hall, his mother, suffered severe physical and emotional injuries.

the State of Nevada and its University successfully sought a writ of certiorari. 436 U. S. 925.

Despite its importance, the question whether a State may claim immunity from suit in the courts of another State has never been addressed by this Court. The question is not expressly answered by any provision of the Constitution; Nevada argues that it is implicitly answered by reference to the common understanding that no sovereign is amenable to suit without its consent—an understanding prevalent when the Constitution was framed and repeatedly reflected in this Court's opinions. In order to determine whether that understanding is embodied in the Constitution, as Nevada claims,[5] it is necessary to consider (1) the source and scope of the traditional doctrine of sovereign immunity; (2) the impact of the doctrine on the framing of the Constitution; (3) the Full Faith and Credit Clause; and (4) other aspects of the Constitution that qualify the sovereignty of the several States.

## I

The doctrine of sovereign immunity is an amalgam of two quite different concepts, one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign.

The immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity.

The doctrine, as it developed at common law, had its origins in the feudal system. Describing those origins, Pollock and Maitland noted that no lord could be sued by a vassal in his

---

[5] No one claims that any federal statute places any relevant restriction on California's jurisdiction or lends any support to Nevada's claim of immunity. If there is a federal rule that restricts California's exercise of jurisdiction in this case, that restriction must be a part of the United States Constitution.

own court, but each petty lord was subject to suit in the courts of a higher lord. Since the King was at the apex of the feudal pyramid, there was no higher court in which he could be sued.[6] The King's immunity rested primarily on the structure of the feudal system and secondarily on a fiction that the King could do no wrong.[7]

We must, of course, reject the fiction. It was rejected by the colonists when they declared their independence from the Crown,[8] and the record in this case discloses an actual wrong committed by Nevada. But the notion that immunity from suit is an attribute of sovereignty is reflected in our cases.

Mr. Chief Justice Jay described sovereignty as the "right to govern"; [9] that kind of right would necessarily encompass the right to determine what suits may be brought in the sovereign's own courts. Thus, Mr. Justice Holmes explained sover-

[6] See 1 F. Pollock & F. Maitland, History of English Law 518 (2d ed. 1899) ("He can not be compelled to answer in his own court, but this is true of every petty lord of every petty manor; that there happens to be in this world no court above his court is, we may say, an accident"); Engdahl, Immunity and Accountability for Positive Governmental Wrongs, 44 U. Colo. L. Rev. 1, 2–5 (1972).

[7] See 1 W. Blackstone, Commentaries *246 ("The king, moreover, is not only incapable of *doing* wrong, but even of *thinking* wrong; he can never mean to do an improper thing"). In fact, however, effective mechanisms developed early in England to redress injuries resulting from the wrongs of the King. See Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 3–5 (1963).

[8] The Declaration of Independence proclaims:

"[T]hat whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to institute new government . . . and such is now the necessity which constrains them to alter their former systems of government. The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute tyranny over these states."

See generally B. Bailyn, The Ideological Origins of the American Revolution 198–229 (1967).

[9] See *Chisholm* v. *Georgia,* 2 Dall. 419, 472.

eign immunity as based "on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." [10]

This explanation adequately supports the conclusion that no sovereign may be sued in its own courts without its consent, but it affords no support for a claim of immunity in another sovereign's courts. Such a claim necessarily implicates the power and authority of a second sovereign; its source must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity.

This point was plainly stated by Mr. Chief Justice Marshall in *The Schooner Exchange* v. *McFaddon*, 7 Cranch 116, which held that an American court could not assert jurisdiction over a vessel in which Napoleon, the reigning Emperor of France, claimed a sovereign right. In that case, the Chief Justice observed:

"The jurisdiction of courts is a branch of that which is possessed by the nation as an independent sovereign power.

"The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.

"All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source." *Id.*, at 136.

---

[10] See *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353.

After noting that the source of any immunity for the French vessel must be found in American law, the Chief Justice interpreted that law as recognizing the common usage among nations in which every sovereign was understood to have waived its exclusive territorial jurisdiction over visiting sovereigns, or their representatives, in certain classes of cases.[11]

The opinion in *The Schooner Exchange* makes clear that if California and Nevada were independent and completely sovereign nations, Nevada's claim of immunity from suit in California's courts would be answered by reference to the law of California.[12] It is fair to infer that if the immunity defense Nevada asserts today had been raised in 1812 when *The Schooner Exchange* was decided, or earlier when the Constitution was being framed, the defense would have been sustained by the California courts.[13] By rejecting the defense in

[11] The opinion describes the exemption of the person of the sovereign from arrest or detention in a foreign territory, the immunity allowed to foreign ministers, and the passage of troops through a country with its permission. 7 Cranch, at 137–140.

[12] Were it an independent sovereign, Nevada might choose to withdraw its money from California banks, or to readjust its own rules as to California's amenability to suit in the Nevada courts. And it might refuse to allow this judgment to be enforced in its courts. But it could not, absent California's consent and absent whatever protection is conferred by the United States Constitution, invoke any higher authority to enforce rules of interstate comity and to stop California from asserting jurisdiction. For to do so would be wholly at odds with the sovereignty of California.

[13] Such a defense was sustained in 1929 by the Supreme Court of North Dakota in *Paulus* v. *South Dakota,* 58 N. D. 643, 647–649, 227 N. W. 52, 54–55. The States' practice of waiving sovereign immunity in their own courts is a relatively recent development; it was only last year, for example, that Pennsylvania concluded that the defense would no longer be recognized, at least in certain circumstances, in that State. See *Mayle* v. *Pennsylvania Dept. of Highways,* 479 Pa. 382, 388 A. 2d 709 (1978); 1978 Pa. Laws, Act. No. 1978–152, to be codified as 42 Pa. Cons. Stat. §§ 5101, 5110. But as States have begun to waive their rights to immunity in their

418

this very case, however, the California courts have told us that whatever California law may have been in the past, it no longer extends immunity to Nevada as a matter of comity.

Nevada quite rightly does not ask us to review the California courts' interpretation of California law. Rather, it argues that California is not free, as a sovereign, to apply its own law, but is bound instead by a federal rule of law implicit in the Constitution that requires all of the States to adhere to the sovereign-immunity doctrine as it prevailed when the Constitution was adopted. Unless such a federal rule exists, we of course have no power to disturb the judgment of the California courts.

## II

Unquestionably the doctrine of sovereign immunity was a matter of importance in the early days of independence.[14] Many of the States were heavily indebted as a result of the Revolutionary War. They were vitally interested in the question whether the creation of a new federal sovereign, with courts of its own, would automatically subject them, like lower English lords, to suits in the courts of the "higher" sovereign.

But the question whether one State might be subject to suit in the courts of another State was apparently not a matter of concern when the new Constitution was being drafted

own courts, it was only to be expected that the privilege of immunity afforded to other States as a matter of comity would be subject to question.

Similarly, as concern for redress of individual injuries has enhanced, so too have moves toward the reappraisal of the practices of sovereign nations according absolute immunity to foreign sovereigns. The governing rule today, in many nations, is one of restrictive rather than absolute immunity. See 26 Dept. State Bull. 984 (1952); Note, The Jurisdictional Immunity of Foreign Sovereigns, 63 Yale L. J. 1148 (1954); Martiniak, Hall v. Nevada: State Court Jurisdiction Over Sister States v. American State Sovereign Immunity, 63 Calif. L. Rev. 1144, 1155–1157 (1975).

[14] See generally C. Jacobs, The Eleventh Amendment and Sovereign Immunity 1–40 (1972).

and ratified. Regardless of whether the Framers were correct in assuming, as presumably they did, that prevailing notions of comity would provide adequate protection against the unlikely prospect of an attempt by the courts of one State to assert jurisdiction over another, the need for constitutional protection against that contingency was not discussed.

The debate about the suability of the States focused on the scope of the judicial power of the United States authorized by Art. III.[15] In The Federalist, Hamilton took the position that this authorization did not extend to suits brought by an individual against a nonconsenting State.[16] The contrary position was also advocated[17] and actually prevailed in this Court's decision in *Chisholm* v. *Georgia,* 2 Dall. 419.

---

[15] Article III provides, in relevant part:

"Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. . . .

"Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

[16] The Federalist No. 81, p. 508 (H. Lodge ed. 1908) (A. Hamilton) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*"); see 3 J. Elliot, Debates on the Federal Constitution 555 (1876) (John Marshall) ("I hope that no gentleman will think that a state will be called at the bar of the federal court. . . . The intent is, to enable states to recover claims of individuals residing in other states. I contend this construction is warranted by the words"). *Id.,* at 533 (James Madison).

[17] See 2 *id.,* at 491 (James Wilson) ("When a citizen has a controversy with another state, there ought to be a tribunal where both parties may stand on a just and equal footing"); Jacobs, *supra* n. 14, at 40 ("[T]he legislative history of the Constitution hardly warrants the conclusion drawn

The *Chisholm* decision led to the prompt adoption of the Eleventh Amendment.[18] That Amendment places explicit limits on the powers of federal courts to entertain suits against a State.[19]

The language used by the Court in cases construing these limits, like the language used during the debates on ratification of the Constitution, emphasized the widespread acceptance of the view that a sovereign State is never amenable to suit without its consent.[20] But all of these cases, and all of the relevant debate, concerned questions of federal-court jurisdiction and the extent to which the States, by ratifying the Constitution and creating federal courts, had authorized suits

---

by some that there was a general understanding, at the time of ratification, that the states would retain their sovereign immunity").

[18] See *Hans* v. *Louisiana,* 134 U. S. 1, 11; *Monaco* v. *Mississippi,* 292 U. S. 313, 325.

[19] The Eleventh Amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Even as so limited, however, the Eleventh Amendment has not accorded the States absolute sovereign immunity in federal-court actions. The States are subject to suit by both their sister States and the United States. See, *e. g., North Dakota* v. *Minnesota,* 263 U. S. 365, 372; *United States* v. *Mississippi,* 380 U. S. 128, 140–141. Further, prospective injunctive and declaratory relief is available against States in suits in federal court in which state officials are the nominal defendants. See *Ex parte Young,* 209 U. S. 123; *Edelman* v. *Jordan,* 415 U. S. 651. See generally Baker, Federalism and the Eleventh Amendment, 48 U. Colo. L. Rev. 139 (1977).

[20] See, *e. g., Hans* v. *Louisiana, supra,* at 18 ("The state courts have no power to entertain suits by individuals against a state without its consent. Then how does the Circuit Court, having only concurrent jurisdiction, acquire any such power?"); *Monaco* v. *Mississippi, supra,* at 322–323 ("There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention' ").

against themselves in those courts. These decisions do not answer the question whether the Constitution places any limit on the exercise of one's State's power to authorize its courts to assert jurisdiction over another State. Nor does anything in Art. III authorizing the judicial power of the United States, or in the Eleventh Amendment limitation on that power, provide any basis, explicit or implicit, for this Court to impose limits on the powers of California exercised in this case. A mandate for federal-court enforcement of interstate comity must find its basis elsewhere in the Constitution.

## III

Nevada claims that the Full Faith and Credit Clause of the Constitution requires California to respect the limitations on Nevada's statutory waiver of its immunity from suit. That waiver only gives Nevada's consent to suits in its own courts. Moreover, even if the waiver is treated as a consent to be sued in California, California must honor the condition attached to that consent and limit respondents' recovery to $25,000, the maximum allowable in an action in Nevada's courts.

The Full Faith and Credit Clause does require each State to give effect to official acts of other States. A judgment entered in one State must be respected in another provided that the first State had jurisdiction over the parties and the subject matter. Moreover, in certain limited situations, the courts of one State must apply the statutory law of another State. Thus, in *Bradford Electric Co.* v. *Clapper,* 286 U. S. 145, the Court held that a federal court sitting in New Hampshire was required by the Constitution to apply Vermont law in an action between a Vermont employee and a Vermont employer arising out of a contract made in Vermont.[21] But this Court's

---

[21] Mr. Justice Stone concurred in the *Clapper* decision, expressing the view that the result was supported by the conflict-of-laws rule that a New Hampshire court could be expected to apply in this situation, and that

decision in *Pacific Insurance Co.* v. *Industrial Accident Comm'n,*
306 U. S. 493, clearly establishes that the Full Faith and
Credit Clause does not require a State to apply another State's
law in violation of its own legitimate public policy.[22]

The question in *Pacific Insurance* was whether the Full
Faith and Credit Clause precluded California from applying
its own workmen's compensation Act in the case of an injury
suffered by a Massachusetts employee of a Massachusetts
employer while in California in the course of his employment.
Even though the employer and employee had agreed to be
bound by Massachusetts law, this Court held that California
was not precluded from applying its own law imposing greater
responsibilities on the employer.   In doing so, the Court
reasoned:

> "It has often been recognized by this Court that there
> are some limitations upon the extent to which a state may
> be required by the full faith and credit clause to enforce
> even the judgment of another state in contravention of
> its own statutes or policy. . . .   And in the case of
> statutes, the extrastate effect of which Congress has not
> prescribed, as it may under the constitutional provision,
> we think the conclusion is unavoidable that the full faith
> and credit clause does not require one state to substitute
> for its own statute, applicable to persons and events
> within it, the conflicting statute of another state, even
> though that statute is of controlling force in the courts of

---

it was unnecessary to rely on the Constitution to support the Court's
judgment.   He also made it clear that the rule of the case did not encom-
pass an action in which the source of the relationship was not a Vermont
contract between a Vermont employer and a Vermont employee.   286
U. S., at 163–165.

[22] See also *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294
U. S. 532; *Bonaparte* v. *Tax Court,* 104 U. S. 592 (holding that a law ex-
empting certain bonds of the enacting State from taxation did not apply
extraterritorially by virtue of the Full Faith and Credit Clause).

the state of its enactment with respect to the same persons and events. . . . Although Massachusetts has an interest in safeguarding the compensation of Massachusetts employees while temporarily abroad in the course of their employment, and may adopt that policy for itself, that could hardly be thought to support an application of the full faith and credit clause which would override the constitutional authority of another state to legislate for the bodily safety and economic protection of employees injured within it. Few matters could be deemed more appropriately the concern of the state in which the injury occurs or more completely within its power." *Id.,* at 502–503.

The *Clapper* case was distinguished on the ground that "there was nothing in the New Hampshire statute, the decisions of its courts, or in the circumstances of the case, to suggest that reliance on the provisions of the Vermont statute, as a defense to the New Hampshire suit, was obnoxious to the policy of New Hampshire." 306 U. S., at 504.[23] In *Pacific Insurance,* on the other hand, California had its own scheme governing compensation for injuries in the State, and the California courts had found that the policy of that scheme would be frustrated were it denied enforcement. "Full faith and credit," this Court concluded, "does not here enable one state to legislate for the other or to project its laws across

---

[23] Mr. Justice Stone who had concurred separately in *Clapper,* see n. 21, *supra,* wrote for the Court in *Pacific Insurance.* After distinguishing *Clapper,* he limited its holding to its facts:

"The *Clapper* case cannot be said to have decided more than that a state statute applicable to employer and employee within the state, which by its terms provides compensation for the employee if he is injured in the course of his employment while temporarily in another state, will be given full faith and credit in the latter when not obnoxious to its policy." 306 U. S., at 504.

state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it." *Id.*, at 504–505.

A similar conclusion is appropriate in this case. The interest of California afforded such respect in the *Pacific Insurance* case was in providing for "the bodily safety and economic protection of employees injured within it." *Id.*, at 503. In this case, California's interest is the closely related and equally substantial one of providing "full protection to those who are injured on its highways through the negligence of both residents and nonresidents." App. to Pet. for Cert. vii. To effectuate this interest, California has provided by statute for jurisdiction in its courts over residents and nonresidents alike to allow those injured on its highways through the neligence of others to secure full compensation for their injuries in the California courts.

In further implementation of that policy, California has unequivocally waived its own immunity from liability for the torts committed by its own agents and authorized full recovery even against the sovereign. As the California courts have found, to require California either to surrender jurisdiction or to limit respondents' recovery to the $25,000 maximum of the Nevada statute would be obnoxious to its statutorily based policies of jurisdiction over nonresident motorists and full recovery. The Full Faith and Credit Clause does not require this result.[24]

## IV

Even apart from the Full Faith and Credit Clause, Nevada argues that the Constitution implicitly establishes a Union in which the States are not free to treat each other as unfriendly

---

[24] California's exercise of jurisdiction in this case poses no substantial threat to our constitutional system of cooperative federalism. Suits involving traffic accidents occurring outside of Nevada could hardly interfere with Nevada's capacity to fulfill its own sovereign responsibilities. We have no occasion, in this case, to consider whether different state policies, either of California or of Nevada, might require a different analysis or a different result.

sovereigns, but must respect the sovereignty of one another. While sovereign nations are free to levy discriminatory taxes on the goods of other nations or to bar their entry altogether, the States of the Union are not.[25] Nor are the States free to deny extradition of a fugitive when a proper demand is made by the executive of another State.[26] And the citizens in each State are entitled to all privileges and immunities of citizens in the several States.[27]

Each of these provisions places a specific limitation on the sovereignty of the several States. Collectively they demonstrate that ours is not a union of 50 wholly independent sovereigns. But these provisions do not imply that any one State's immunity from suit in the courts of another State is anything other than a matter of comity. Indeed, in view of the Tenth Amendment's reminder that powers not delegated to the Federal Government nor prohibited to the States are reserved to the States or to the people,[28] the existence of express limitations on state sovereignty may equally imply that caution should be exercised before concluding that unstated limitations on state power were intended by the Framers.

In the past, this Court has presumed that the States intended to adopt policies of broad comity toward one another. But this presumption reflected an understanding of state policy, rather than a constitutional command. As this Court stated in *Bank of Augusta* v. *Earle,* 13 Pet. 519, 590:

> "The intimate union of these states, as members of the same great political family; the deep and vital interests

---

[25] See U. S. Const., Art. I, § 8.

[26] Art. IV, § 2.

[27] *Ibid.*

[28] The Tenth Amendment to the United States Constitution provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

which bind them so closely together; should lead us, in the absence of proof to the contrary, to presume a greater degree of comity, and friendship, and kindness towards one another, than we should be authorized to presume between foreign nations. And when (as without doubt must occasionally happen) the interest or policy of any state requires it to restrict the rule, it has but to declare its will, and the legal presumption is at once at an end."

In this case, California has "declared its will"; it has adopted as its policy full compensation in its courts for injuries on its highways resulting from the negligence of others, whether those others be residents or nonresidents, agents of the State, or private citizens. Nothing in the Federal Constitution authorizes or obligates this Court to frustrate that policy out of enforced respect for the sovereignty of Nevada.[29]

In this Nation each sovereign governs only with the consent of the governed. The people of Nevada have consented to a system in which their State is subject only to limited liability in tort. But the people of California, who have had no voice in Nevada's decision, have adopted a different system. Each of these decisions is equally entitled to our respect.

It may be wise policy, as a matter of harmonious interstate relations, for States to accord each other immunity or to respect any established limits on liability. They are free to do so. But if a federal court were to hold, by inference from the structure of our Constitution and nothing else, that California is not free in this case to enforce its policy of full compensation, that holding would constitute the real intru-

---

[29] Cf. *Georgia* v. *Chattanooga,* 264 U. S. 472, 480 ("Land acquired by one State in another State is held subject to the laws of the latter and to all the incidents of private ownership. The proprietary right of the owning State does not restrict or modify the power of eminent domain of the State wherein the land is situated").

sion on the sovereignty of the States—and the power of the people—in our Union.

The judgment of the California Court of Appeal is

*Affirmed.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The Court, in a plausible opinion, holds that the State of Nevada is subject to an unconsented suit in a California state court for damages in tort. This result at first glance does not seem too unreasonable. One might well ask why Nevada, even though it is a State, and even though it has not given its consent, should not be responsible for the wrong its servant perpetrated on a California highway. And one might also inquire how it is that, if no provision of our national Constitution specifically prevents the nonimmunity result, these tort action plaintiffs could be denied their judgment.

But the Court paints with a very broad brush, and I am troubled by the implications of its holding. Despite a fragile footnote disclaimer, *ante,* at 424 n. 24, the Court's basic and undeniable ruling is that what we have always thought of as a "sovereign State" is now to be treated in the courts of a sister State, once jurisdiction is obtained, just as any other litigant. I fear the ultimate consequences of that holding, and I suspect that the Court has opened the door to avenues of liability and interstate retaliation that will prove unsettling and upsetting for our federal system. Accordingly, I dissent.

It is important to note that at the time of the Constitutional Convention, as the Court concedes, there was "widespread acceptance of the view that a sovereign State is never amenable to suit without its consent." *Ante,* at 420. The Court also acknowledges that "the notion that immunity from suit is an attribute of sovereignty is reflected in our cases." *Ante,* at 415. Despite these concessions, the Court holds that the sovereign-immunity doctrine is a mere matter of "comity"

428

which a State is free to reject whenever its "policy" so dictates. *Ante,* at 426.

There is no limit to the breadth of the Court's rationale, which goes beyond the approach taken by the California Court of Appeal in this case. That court theorized that Nevada was not "sovereign" for purposes of this case because sovereignty ended at the California-Nevada line: " 'When the sister state enters into activities in this state, it is not exercising sovereign power over the citizens of this state and is not entitled to the benefits of the sovereign immunity doctrine as to those activities unless this state has conferred immunity by law or as a matter of comity.' " *Hall* v. *University of Nevada,* 74 Cal. App. 3d 280, 284, 141 Cal. Rptr. 439, 441 (1977), quoting *Hall* v. *University of Nevada,* 8 Cal. 3d 522, 524, 503 P. 2d 1363, 1364 (1972), cert. denied, 414 U. S. 820 (1973). The California court, in other words, recognized that sovereign States are immune from unconsented suit; it held only that this rule failed in its application on the facts because Nevada was not a "sovereign" when its agent entered California and committed a tort there. Indeed, the court said flatly that " 'state sovereignty ends at the state boundary,' " 74 Cal. App. 3d, at 284, 141 Cal. Rptr., at 441, again quoting *Hall,* 8 Cal. 3d, at 525, 503 P. 2d, at 1365.

That reasoning finds no place in this Court's opinion. Rather, the Court assumes that Nevada is "sovereign," but then concludes that the sovereign-immunity doctrine has no *constitutional* source. Thus, it says, California can abolish the doctrine at will. By this reasoning, Nevada's amenability to suit in California is not conditioned on its agent's having committed a tortious act in California. Since the Court finds no constitutional source for the sovereign-immunity doctrine, California, so far as the Federal Constitution is concerned, is able and free to treat Nevada, and any other State, just as it would treat any other litigant. The Court's theory means that State A constitutionally can be sued by an individual in

the courts of State B on any cause of action, provided only that the plaintiff in State B obtains jurisdiction over State A consistently with the Due Process Clause.

The Court, by its footnote 24, *ante,* at 424, purports to confine its holding to traffic-accident torts committed outside the defendant State, and perhaps even to traffic "policies." Such facts, however, play absolutely no part in the reasoning by which the Court reaches its conclusion. The Court says merely that "California has 'declared its will'; it has adopted as its policy full compensation in its courts for injuries on its highways . . . . Nothing in the Federal Constitution authorizes or obligates this Court to frustrate that policy." *Ante,* at 426. There is no suggestion in this language that, if California had adopted some other policy in some other area of the law, the result would be any different. If, indeed, there is "[n]othing in the Federal Constitution" that allows frustration of California's policy, it is hard to see just how the Court could use a different analysis or reach a different result in a different case.

The Court's expansive logic and broad holding—that so far as the Constitution is concerned, State A can be sued in State B on the same terms any other litigant can be sued— will place severe strains on our system of cooperative federalism. States in all likelihood will retaliate against one another for respectively abolishing the "sovereign immunity" doctrine. States' legal officers will be required to defend suits in all other States. States probably will decide to modify their tax-collection and revenue systems in order to avoid the collection of judgments. In this very case, for example, Nevada evidently maintains cash balances in California banks to facilitate the collection of sales taxes from California corporations doing business in Nevada. Pet. for Cert. 5. Under the Court's decision, Nevada will have strong incentive to withdraw those balances and place them in Nevada banks so as to insulate itself from California judgments. If respond-

ents were forced to seek satisfaction of their judgment in Nevada, that State, of course, might endeavor to refuse to enforce that judgment, or enforce it only on Nevada's terms. The Court's decision, thus, may force radical changes in the way States do business with one another, and it imposes, as well, financial and administrative burdens on the States themselves.

I must agree with the Court that if the judgment of the California Court of Appeal is to be reversed, a constitutional source for Nevada's sovereign immunity must be found. I would find that source not in an express provision of the Constitution but in a guarantee that is implied as an essential component of federalism. The Court has had no difficulty in implying the guarantee of freedom of association in the First Amendment, *NAACP* v. *Button,* 371 U. S. 415, 430–431 (1963); *Kusper* v. *Pontikes,* 414 U. S. 51, 56–57 (1973), and it has had no difficulty in implying a right of interstate travel, *Shapiro* v. *Thompson,* 394 U. S. 618 (1969); *United States* v. *Guest,* 383 U. S. 745 (1966). In the latter case, the Court observed, *id.,* at 757: "The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union." And although the right of interstate travel "finds no explicit mention in the Constitution," the reason, "it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Id.,* at 758. Accordingly, the Court acknowledged the existence of this constitutional right without finding it necessary "to ascribe the source of this right . . . to a particular constitutional provision." *Shapiro* v. *Thompson,* 394 U. S., at 630.

I have no difficulty in accepting the same argument for the existence of a constitutional doctrine of interstate sovereign immunity. The Court's acknowledgment, referred to above, that the Framers must have assumed that States were immune

from suit in the courts of their sister States lends substantial support. The only reason why this immunity did not receive specific mention is that it was too obvious to deserve mention. The prompt passage of the Eleventh Amendment nullifying the decision in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), is surely significant. If the Framers were indeed concerned lest the States be haled before the federal courts—as the courts of a " 'higher' sovereign," *ante,* at 418—how much more must they have reprehended the notion of a State's being haled before the courts of a sister State. The concept of sovereign immunity prevailed at the time of the Constitutional Convention. It is, for me, sufficiently fundamental to our federal structure to have implicit constitutional dimension. Indeed, if the Court means what it implies in its footnote 24—that *some* state policies might require a different result—it must be suggesting that there are some federalism constraints on a State's amenability to suit in the courts of another State. If that is so, the only question is whether the facts of this case are sufficient to call the implicit constitutional right of sovereign immunity into play here. I would answer that question in the affirmative.

Finally, it strikes me as somewhat curious that the Court relegates to a passing footnote reference what apparently is the only other appellate litigation in which the precise question presented here was considered and, indeed, in which the Court's result was rejected. *Paulus* v. *South Dakota,* 52 N. D. 84, 201 N. W. 867 (1924); *Paulus* v. *South Dakota,* 58 N. D. 643, 227 N. W. 52 (1929). The plaintiff there was injured in a coal mine operated in North Dakota by the State of South Dakota. He sued South Dakota in a North Dakota state court. The Supreme Court of North Dakota rejected the plaintiff's contention that South Dakota "discards its sovereignty when it crosses the boundary line." 52 N. D., at 92, 201 N. W., at 870. It held that South Dakota was immune from suit in the North Dakota courts;

"Therefore, in the absence of allegations as to the law of the sister state showing a consent to be sued, the courts of this state must necessarily regard a sovereign sister state as immune to the same extent that this state would be immune in the absence of a consenting statute." 58 N. D., at 647, 227 N. W., at 54. The court noted that under the Eleventh Amendment no State could be sued in federal court by a citizen of another State. "Much less," the court reasoned, "would it be consistent with any sound conception of sovereignty that a state might be haled into the courts of a sister sovereign state at the will or behest of citizens or residents of the latter." *Id.*, at 649, 227 N. W., at 55. The Supreme Court of California purported to distinguish *Paulus* (citing only the first opinion in that litigation) on the ground that "the plaintiff was a citizen of South Dakota." *Hall* v. *University of Nevada,* 8 Cal. 3d, at 525, 503 P. 2d, at 1365. That court, however, made no reference to the Supreme Court of North Dakota's second opinion and thus passed over the fact that the plaintiff had amended his complaint to allege that he was a resident of North Dakota. The North Dakota Supreme Court then held that that fact "in nowise alter[ed]" its view of the immunity issue. 58 N. D., at 648, 227 N. W., at 54. Thus, the only authority that has been cited to us or that we have found is directly opposed to the Court's conclusion.

I would reverse the judgment of the California Court of Appeal, and remit the plaintiffs-respondents to those remedies prescribed by the statutes of Nevada.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting

Like my Brother BLACKMUN, I cannot agree with the majority that there is no constitutional source for the sovereign immunity asserted in this case by the State of Nevada. I think the Court's decision today works a fundamental readjustment of interstate relationships which is impossible to

reconcile not only with an "assumption" this and other courts have entertained for almost 200 years, but also with express holdings of this Court and the logic of the constitutional plan itself.

Any document—particularly a constitution—is built on certain postulates or assumptions; it draws on shared experience and common understanding. On a certain level, that observation is obvious. Concepts such as "State" and "Bill of Attainder" are not defined in the Constitution and demand external referents. But on a more subtle plane, when the Constitution is ambiguous or silent on a particular issue, this Court has often relied on notions of a constitutional plan—the implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers. The tacit postulates yielded by that ordering are as much engrained in the fabric of the document as its express provisions, because without them the Constitution is denied force and often meaning.[1] Thus, in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), Mr. Chief Justice Marshall, writing for the Court, invalidated a state tax on a federal instrumentality even though no express provision for intergovernmental tax immunity can be found in

---

[1] Mr. Chief Justice Marshall captured this idea in *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819):

"A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves."

This was the preface to the famous line: "In considering this question, then, we must never forget, that it is *a constitution* we are expounding." *Ibid.* (Emphasis in original.)

the Constitution. He relied on the notion that the power to tax is the power to destroy, and that to concede the States such a power would place at their mercy the Constitution's affirmative grants of authority to the Federal Government— a result the Framers could not have intended. More recently this Court invalidated a federal minimum wage for state employees on the ground that it threatened the States' " 'ability to function effectively in a federal system.' " *National League of Cities* v. *Usery,* 426 U. S. 833, 852 (1976), quoting *Fry* v. *United States,* 421 U. S. 542, 547 n. 7 (1975). The Court's literalism, therefore, cannot be dispositive here, and we must examine further the understanding of the Framers and the consequent doctrinal evolution of concepts of state sovereignty.

Article III, like virtually every other Article of the Constitution, was inspired by the experience under the Articles of Confederation. To speak of the "judicial Power" of the United States under the Articles of Confederation is to invite charges of pretense, for there was very little latitude for federal resolution of disputes. The Confederation Congress could create prize courts and courts for the adjudication of "high seas" crimes. It could set up ad hoc and essentially powerless tribunals to consider controversies between States and between individuals who claimed lands under the grants of different States.[2] But with respect to all other disputes of interstate or international significance, the litigants were left to the state courts and to the provincialism that proved the bane of this country's earliest attempt at political organization.

One obvious attribute of Art. III in light of the Confederation experience was the potential for a system of neutral forums for the settlement of disputes between States and citizens of different States. The theme recurs throughout the

---

[2] 1 J. Goebel, History of the Supreme Court of the United States: Antecedents and Beginnings to 1801, pp. 143–195 (O. W. Holmes Devise History 1971); C. Jacobs, The Eleventh Amendment and Sovereign Immunity 9 (1972).

ratification debates. For example, during the debates in North Carolina, William Davie, a member of the Constitutional Convention, observed:

"It has been equally ceded, by the strongest opposers to this government, that the federal courts should have cognizance of controversies between two or more states, between a state and the citizens of another state, and between the citizens of the same state claiming lands under the grant of different states. Its jurisdiction in these cases is necessary to secure impartiality in decisions, and preserve tranquility among the states. It is impossible that there should be impartiality when a party affected is to be judge.

"The security of impartiality is the principal reason for giving up the ultimate decision of controversies between citizens of different states." 4 J. Elliot, Debates on the Federal Constitution 159 (1876) (hereinafter Elliot's Debates).

As the Court observes, the matter of sovereign immunity was indeed a subject of great importance in the early days of the Republic. In fact, it received considerable attention in the years immediately preceding the Constitutional Convention. In 1781 a citizen of Pennsylvania brought suit in the Pennsylvania courts in an effort to attach property belonging to Virginia that was located in Philadelphia Harbor. The case raised such concerns throughout the States that the Virginia delegation to the Confederation Congress sought the suppression of the attachment order. The Pennsylvania Court of Common Pleas ultimately held that by virtue of its sovereign immunity, Virginia was immune from the processes of Pennsylvania. Nathan v. Virginia, 1 Dall. 77 (1781).

That experience undoubtedly left an impression—particularly on Virginians—and throughout the debates on the Constitution fears were expressed that extending the judicial power of the United States to controversies "between a state

and citizens of another state" would abrogate the States' sovereign immunity. James Madison and John Marshall repeatedly assured opponents of the Constitution, such as Patrick Henry, that the sovereign immunity of the States was secure.[3] Alexander Hamilton as Publius wrote:

"It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal." The Federalist No. 81, p. 508 (H. Lodge ed. 1908) (emphasis in original).

In *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), this Court

---

[3] 3 Elliot's Debates 533 (James Madison):

"[Federal-court] jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. The only operation it can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal court."

*Id.,* at 555–556 (John Marshall):

"It is not rational to suppose that the sovereign power should be dragged before a court. The intent is, to enable states to recover claims of individuals residing in other states. I contend this construction is warranted by the words. But, say they, there will be partiality in it if a state cannot be defendant—if an individual cannot proceed to obtain judgment against a state, though he may be sued by a state. It is necessary to be so, and cannot be avoided."

Although there were those other than opponents of the Constitution who suggested that Art. III was an abrogation of state sovereign immunity—Edmund Randolph and James Wilson being the most eminent—this Court has consistently taken the views of Madison, Marshall, and Hamilton as capturing the true intent of the Framers. See *Edelman* v. *Jordan,* 415 U. S. 651, 660–662, n. 9 (1974); *Monaco* v. *Mississippi,* 292 U. S. 313, 323–330 (1934); *Hans* v. *Louisiana,* 134 U. S. 1, 12–15 (1890).

disagreed with the Madison-Marshall-Hamilton triumvirate, and its judgment was in turn overruled by the Eleventh Amendment.[4] By its terms that Amendment only deprives federal courts of jurisdiction where a State is haled into court by citizens of another State or of a foreign country. Yet it is equally clear that the States that ratified the Eleventh Amendment thought that they were putting an end to the possibility of individual States as unconsenting defendants in foreign jurisdictions, for, as MR. JUSTICE BLACKMUN notes, they would have otherwise perversely foreclosed the neutral federal forums only to be left to defend suits in the courts of other States. The Eleventh Amendment is thus built on the postulate that States are not, absent their consent, amenable to suit in the courts of sister States.

This I think explains why this Court on a number of occasions has indicated that unconsenting States are not subject to the jurisdiction of the courts of other States. In *Beers* v. *Arkansas*, 20 How. 527, 529 (1858), Mr. Chief Justice Taney observed in an opinion for the Court that it "is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission." Some 25 years later Mr. Justice Miller, again for the Court, was even more explicit:

> "It may be accepted as a point of departure unquestioned, that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution.

> "This principle is conceded in all the cases, and whenever it can be clearly seen that the State is an indispen-

---

[4] The adverse reaction to *Chisholm* was immediate, widespread, and vociferous. 1 Goebel, *supra* n. 2, at 734–741.

438

sible party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction." *Cunningham* v. *Macon & Brunswick R. Co.,* 109 U. S. 446, 451 (1883).

The most recent statement by this Court on the topic appears to be that authored by Mr. Justice Black in *Western Union Telegraph Co.* v. *Pennsylvania,* 368 U. S. 71 (1961), which held that Western Union's due process rights would be violated if Pennsylvania escheated Western Union's unclaimed money orders. The Court found that conclusion compelled by Pennsylvania's inability to provide Western Union with a forum where all claims, including those of other States, could be resolved. The Court noted that "[i]t is plain that Pennsylvania courts, with no power to bring other States before them, cannot give such hearings." *Id.,* at 80.

When the State's constitutional right to sovereign immunity has been described, it has been in expansive terms. In *Great Northern Insurance Co.* v. *Read,* 322 U. S. 47, 51 (1944), the Court stated:

"Efforts to force, through suits against officials, performance of promises by a state collide directly with the necessity that a sovereign must be free from judicial compulsion in the carrying out of its policies within the limits of the Constitution. . . . A state's *freedom from litigation* was established as a constitutional right through the Eleventh Amendment." (Emphasis added.)

Although Mr. Justice Frankfurter disagreed with the *Great Northern Insurance Co.* majority on the issue of consent, he was in complete agreement on the broad nature of the right.

"The Eleventh Amendment has put state immunity from suit into the Constitution. Therefore, it is not in the power of individuals to bring any State into court— the State's or that of the United States—except with its consent." *Id.,* at 59 (dissenting opinion).

Presumably the Court today dismisses all of this as dicta. Yet these statements—far better than the Court's literalism—comport with the general approach to sovereign-immunity questions evinced in this Court's prior cases. Those cases have consistently recognized that Art. III and the Eleventh Amendment are built on important concepts of sovereignty that do not find expression in the literal terms of those provisions, but which are of constitutional dimension because their derogation would undermine the logic of the constitutional scheme. In *Hans* v. *Louisiana,* 134 U. S. 1 (1890), the Eleventh Amendment was found to bar federal-court suits against a State brought by its own citizens, despite the lack of any reference to such suits in the Amendment itself. The Court found this limit on the judicial power in the "established order of things"—an order that eschewed the "anomalous result, that in cases arising under the Constitution or laws of the United States, a State may be sued in the federal courts by its own citizens, though it cannot be sued for a like cause of action by the citizens of other States, or of a foreign state; and may be thus sued in the federal courts, although not allowing itself to be sued in its own courts." *Id.,* at 10, 14. The anomaly lay in the availability of the neutral forum in cases where there was some political check on parochialism—suits against a State by its own citizens—and its unavailability in situations where concerns of a biased tribunal were most acute—suits against a State by citizens of another State. The *Hans* Court, speaking through Mr. Justice Bradley, concluded:

> "It is not necessary that we should enter upon an examination of the reason or expediency of the rule which exempts a sovereign State from prosecution in a court of justice at the suit of individuals. . . . It is enough for us to declare its existence. The legislative department of a State represents its polity and its will; and is called upon by the highest demands of natural and political law to preserve justice and judgment, and to

hold inviolate the public obligations. Any departure from this rule, except for reasons most cogent, (of which the legislature, and not the courts, is the judge,) never fails in the end to incur the odium of the world, and to bring lasting injury upon the State itself. But to deprive the legislature of the power of judging what the honor and safety of the State may require, even at the expense of a temporary failure to discharge the public debts, would be attended with greater evils than such failure can cause." *Id.*, at 21.

Similarly, in *Monaco* v. *Mississippi*, 292 U. S. 313 (1934), this Court relied on precepts underlying but not explicit in Art. III and the Eleventh Amendment to conclude that this Court was without jurisdiction to entertain a suit brought by the Principality of Monaco against the State of Mississippi for payment on bonds issued by the State. On its face, Art. III would suggest that such a suit could be entertained, and such actions are not addressed by the terms of the Eleventh Amendment. But Mr. Chief Justice Hughes in *Monaco* did not so limit his analysis, and held that the Court could not entertain the suit without Mississippi's consent.

"Manifestly, we cannot rest with a mere literal application of the words of § 2 of Article III, or assume that the letter of the Eleventh .Amendment exhausts the restrictions upon suits against non-consenting States. *Behind the words of the constitutional provisions are postulates which limit and control.* There is the essential postulate that the controversies, as contemplated, shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.' The Federalist No. 81. The question is whether the plan of the Constitution involves the surrender of immunity

when the suit is brought against a State, without her consent, by a foreign State." *Id.*, at 322–323 (emphasis added).[5]

Likewise, I think here the Court should have been sensitive to the constitutional plan and avoided a result that destroys the logic of the Framers' careful allocation of responsibility among the state and federal judiciaries, and makes nonsense of the effort embodied in the Eleventh Amendment to preserve the doctrine of sovereign immunity. Mr. Justice Blackmun's references to the "right to travel" cases is most telling. In the first such case, *Crandall* v. *Nevada,* 6 Wall. 35 (1868), the Court invalidated a Nevada head tax on exit from the State, relying in large part on *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819). The essential logic of the opinion is that to admit such power would be to concede to the States the ability to frustrate the exercise of authority delegated to the Federal Government—for example, the power to transport armies and to maintain postal services. There is also the theme that the power to obstruct totally the movements of people is incompatible with the concept of one Nation. The Court admitted that "no express provision of the Constitution" addressed the problem, 6 Wall., at 48; but it concluded that the constitutional framework demanded that the tax be proscribed lest it sap the logic and vitality of the express provisions.[6]

---

[5] These cases do not exhaust the contexts in which this Court has invoked the constitutional plan to find a State was not amenable to an unconsented suit despite the absence of express protection in the Constitution. See, *e. g., Ex parte New York,* 256 U. S. 490 (1921) (admiralty cases); *Smith* v. *Reeves,* 178 U. S. 436 (1900) (suits by federal corporations).

[6] The Court appealed to the logic and structure of the constitutional scheme because the case was decided before ratification of the Fourteenth Amendment, and therefore the Court could not avail itself of the flexible analytical "tools" provided by the Equal Protection Clause and the Due Process Clause.

The incompatibility of the majority's position in this case with the constitutional plan is even more apparent than that in *Crandall*. I would venture to say that it is much more apparent than the incompatibility of the one-year residency requirement imposed on Thompson as a precondition to receipt of AFDC benefits.[7] Despite the historical justification of federal courts as neutral forums, now suits against unconsenting States by citizens of different States can *only* be brought in the courts of other States. That result is achieved because in the effort to "protect" the sovereignty of individual States, state legislators had the lack of foresight to ratify the Eleventh Amendment. The State cannot even remove the action to federal court, because it is not a citizen for purposes of diversity jurisdiction. *Moor* v. *County of Alameda*, 411 U. S. 693, 717 (1973); *Postal Telegraph Cable Co.* v. *Alabama*, 155 U. S. 482, 487 (1894). Ironically, and I think wrongly, the Court transforms what it described as a constitutional right in *Edelman* v. *Jordan*, 415 U. S. 651, 673 (1974), and *Great Northern Insurance Co.* v. *Read*, 322 U. S. 47 (1944), into an albatross.

I join my Brother BLACKMUN's doubts about footnote 24 of the majority opinion. Where will the Court find its principles of "cooperative federalism"? Despite the historical justification of federal courts as neutral forums, despite an understanding shared by the Framers and, for close to 200 years, expounded by some of the most respected Members of this Court, and despite the fact that it is the operative postulate that makes sense of the Eleventh Amendment, the Court concludes that the rule that an unconsenting State is not subject to the jurisdiction of the courts of a different State finds no support "explicit or implicit" in the Constitution. *Ante*, at 421. If this clear guidance is not enough, I do not see how the Court's suggestion that limits on state-court jurisdiction may be found in principles of "cooperative federalism" can be taken

---

[7] *Shapiro* v. *Thompson*, 394 U. S. 618 (1969).

seriously. Yet given the ingenuity of our profession, pressure for such limits will inevitably increase. Having shunned the obvious, the Court is truly adrift on uncharted waters; the ultimate balance struck in the name of "cooperative federalism" can be only a series of unsatisfactory bailing operations in fact.

I am also concerned about the practical implications of this decision. The federal system as expressed in the Constitution—with the exception of representation in the House—is built on notions of state parity. No system is truly federal otherwise. This decision cannot help but induce some "Balkanization" in state relationships as States try to isolate assets from foreign judgments and generally reduce their contacts with other jurisdictions. That will work to the detriment of smaller States—like Nevada—who are more dependent on the facilities of a dominant neighbor—in this case, California.

The problem of enforcement of a judgment against a State creates a host of additional difficulties. Assuming Nevada has no seizable assets in California, can the plaintiff obtain enforcement of California's judgment in Nevada courts? Can Nevada refuse to give the California judgment "full faith and credit" because it is against state policy? Can Nevada challenge the seizure of its assets by California in this Court? If not, are the States relegated to the choice between the gamesmanship and tests of strength that characterize international disputes, on the one hand, and the midnight seizure of assets associated with private debt collection on the other?

I think the Framers and our predecessors on this Court expressed the appropriate limits on the doctrine of state sovereign immunity. Since the California judgment under review transgresses those limits, I respectfully dissent.