**CITY OF DANVILLE, Kentucky, a Municipal Corporation of the Third Class, Appellant,**

v.

**Bennie SMALLWOOD et al., Appellees.**

Court of Appeals of Kentucky.

June 9, 1961.

James G. Sheehan, Jr., Wesley Gilmer Jr., Danville, for appellant.

James F. Clay, Danville, for appellees.

MOREMEN, Judge.

The question on this appeal is whether appellant, City of Danville, by improperly constructing a storm sewer, took private property belonging to appellees Smallwood for a public purpose for which compensation must be paid under Section 242 of the Kentucky Constitution. After trial the court entered judgment awarding damages for the taking—hence this appeal.

The Smallwoods purchased the house and lot here involved in 1956. The lot is located on the south side of East Main Street which extends in an east and west direction and slopes down hill to the east. The grade is considerable as it declines from an elevation of about 983 to 946 feet in approximately 1,250 feet. To the east of the Smallwoods and on the same side of the street is the Kerbaugh residence, then the Colclough residence, then a rock wall, which is mentioned often in the evidence, and then the residence of Mrs. Collier. The north side of the street is also built up and some of the houses have been there for a long time. The city limits formerly stopped at the rock wall but later the city annexed territory east of it and the area we have described is now within the city.

Before annexation a basin caught some of the water on the north side of the street and it was channeled under the street to the south side. Then it was conducted through tile diagonally across the front of the Colclough and Kerbaugh properties to the east

property line belonging to Kerbaugh where the tile pipe terminated. From this point the water flowed between the Kerbaugh and Smallwood houses to the rear of the lots into a sink hole. It was shown that the surface water from the street and from the surface on the south side of the street flowed between the various houses we have mentioned. On the north side of the street and east of the catch basin there was an open ditch which carried water from a portion of the sharply sloping terrain on that side of the street further down the hill from the Smallwood residence. Although it appears that the Smallwoods previously had been subjected to the flow of some water from the north side of the street it had drained between their home and their immediate neighbor's and had never cut across the front of their yard or caused damage of any significance.

In July of 1958, the city commenced construction of a storm sewer from a point west of the Collier house on the south side of Main Street and in doing so the former channel, which carried water from a portion of the north side area to a point between the Kerbaugh and the Smallwood houses, was blocked off and the water was forced into a 15″ concrete pipe which ended in front of the Smallwood residence. Some dirt was piled near the end of the tile. This whole record is not too clear as to just how this was done but it is plain that the termination of the pipe, together with the obstruction caused by the pile of dirt, caused an unnatural diversion of the water course which later caused the damage. It is apparent that on the north side of the street the water was also damned by a pile of dirt in the ditch which had formerly carried some of the surface water from the north side of Main Street with the result that additional water from the north side was forced across the Smallwood property.

On August 11, 1958, about two weeks after the city had ceased to work upon this project (the city engineer testified that the job was not completed but he had ordered only one truck load of pipe and they had used that up) a heavy rainfall occurred. At about 5:30 p. m., but before there had been any damage to the property, the city was notified of the condition. A representative called but nothing was done to remedy the situation. Later in the night, after a very heavy rain, the water rushed down onto and across the front and side yards of the Smallwood home and so undermined the foundation of the house that large portions of it collapsed. This caused the house to sag and resulted in considerable damage. The yard was also severely washed and damaged.

Appellant urges as grounds for reversal that the court erred in failing to sustain its motion for a peremptory instruction and its motion for a judgment notwithstanding the verdict.

Appellant relies upon V. T. C. Lines v. City of Harlan, Ky., 313 S.W.2d 573, to support its contention that this case should be reversed. There, damages were sustained by a bus company caused by sand blasting operations by the city when cleaning its swimming pool with the result that emery dust settled on the bus station and caused damages to working parts of diesel engines used in the buses.

After a discussion of cases dealing with the immunity of the soverign to answer for negligent acts committed by it, not in connection with eminent domain or police power, but which was derived from the primitive right that absolute sovereigns had to be free from the consequences of any acts, we concluded that this sand blasting operation was a direct act of negligence which did not involve the right of eminent domain and therefore fell under the sovereign immunity rule. The apparent conflict between the many cases on this question was discussed and it will not be re-discussed here.

We are concerned here only with the question of whether the facts in this case constitute "a condemnation suit in reverse,"

or "a retroactive condemnation of land." We are of opinion that the facts of this case compel the application of the rule that compensation must be paid for the taking under section 242 of the Constitution. Commonwealth v. Kelly, 314 Ky. 581, 236 S.W.2d 695, Commonwealth v. Geary, Ky., 254 S.W.2d 477, and City of Newport v. Rosing, Ky., 319 S.W.2d 852, 853. We believe the latter case is exactly in point. In the opinion it is said:

"The city undertook to widen and deepen the channel. In the course of this work the toe of the slope from plaintiffs' properties was cut off. This removed lateral support from these lands, causing the land and the houses thereon to slide toward the creek, completely destroying the homes.

"The essential facts in this controversy are not in dispute. The city, in undertaking a public improvement, destroyed the property of adjoining landowners. This constituted a 'taking' of property under section 242 of the Kentucky Constitution, and the municipality must pay just compensation therefor by way of damages. Perry County v. Townes, 228 Ky. 608, 15 S.W.2d 521; Jefferson County v. Bischoff, 238 Ky. 176, 37 S.W.2d 24; City of Covington v. Parsons, 258 Ky. 22, 79 S.W.2d 353."

■ Appellant next argues that appellees failed to introduce evidence that supported the jurors' finding under the instruction given as to the amount of damage. On this account the court instructed as follows:

"If you find for the plaintiffs, the Smallwoods, you will award them such a sum in damages as you believe from the evidence will be the fair and reasonable cost of restoring such residence, by reason of any damages suffered by said waters to substantially the same condition the residence was in immediately before said damage was done, not

to exceed on this account $5975.50, the sum sued for in this respect * * *."

As was stated in Price v. Dickson, Ky., 317 S.W.2d 156, 157:

"While 'diminution in the value of the use of property' is a rather elusive concept, it has been recognized that the cost of reasonably necessary repairs is a proper factor to be taken into consideration. Hutchison v. City of Maysville, 100 S.W. 331, 30 Ky.Law Rep. 1173; Gay v. Perry, 205 Ky. 38, 265 S.W. 437; City of Jackson v. Haddix, 280 Ky. 436, 133 S.W.2d 547. Also discomfort caused by this type of injury may be considered as an element of damages. Mahan v. Doggett, 84 S.W. 525, 27 Ky.Law. Rep. 103. It is a proper incident in determining the diminution in value of the use of the property. Gay v. Perry, 205 Ky. 38, 265 S.W. 437, above cited."

A contractor who was introduced by appellees testified:

"Q. Did you make an estimate of what it would cost to restore that house to the condition it was previous to the damage the water had done? A. I did.

"Q. Do you have that estimate with you? A. Yes, sir.

"Q. Tell the jury what the total estimate of restoration was. A. Six thousand, two hundred dollars and fifty cents."

■ On cross-examination it was shown that in calculating the cost of restoration the witness had used the price of 12" blocks when the blocks which originally had formed the foundation were 8" blocks. These were about 14¢ cheaper than the 12" blocks. He estimated that about 1500 blocks would be needed and the difference in cost would be approximately $210. While we are not holding that all restorations must be accomplished by using identical material as in the original structure, we believe the jury well understood the value of this testimony.

The instruction permitted them to recover $5,975.50, plus the sum of $85 per month for the loss of the use of the home. The verdict returned by the jury for the entire damages was the sum of $3,172.75. Appellant was not prejudiced.

This case was tried throughout on the theory of "restoration" without objection from appellant. No objection to the instruction was made on the ground that it submitted the case on restoration costs alone rather than on diminution of value. Thus it is unnecessary to consider whether the instruction embraced the correct measure of damages.

Finally we see nothing of merit in appellant's contention that appellees assumed the risk of being flooded when they purchased this house. They did not assume the risk that the city, by means of a new channel for water flow and the diversion of other water by means of a dirt dam, would flood and destroy their property.

The city had a fair trial and the judgment is affirmed.