Affirmed in Part, Reversed and Remanded in Part, Reversed
and Rendered in Part, and Majority and Dissenting Opinions filed June 15, 2010.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00244-CV

___________________

 

TEXAS DEPARTMENT OF TRANSPORTATION, Appellant

 

V.

 

ZULEIMA OLIVARES, Individually
and as the Representative of the ESTATE OF PEDRO OLIVARES, JR., and PEDRO OLIVARES, Individually, Appellees



 



 

 

On Appeal from the 334th District Court

Harris County, Texas

Trial Court Cause No. 2008-19417



 



 

 

D I S S E N T I N G   O P I N I O N

            Because the Texas Department of Transportation enjoys
sovereign immunity and, in my view, has not waived such immunity, I must
dissent.

            From the pleadings, briefs, and oral arguments it appears
there is general agreement among the parties as to the factual background
leading to the plaintiffs’ loss.  In the early morning hours of January 1,
2007, a severely intoxicated Michael Ladson was observed by startled motorists
driving the wrong way in the westbound lanes of a divided highway, namely, the
Westpark Tollway.[1] 
From eyewitness accounts and 911 telephone calls, it appears Ladson continued
driving against the traffic for approximately eight and one half miles until he
fatally crashed head-on into the appellees’ vehicle.  How and where Ladson
entered the westbound lanes of traffic is not known.  However, based on Ladson’s
location at the time the initial reports of his erratic behavior were received,
the closest possible point of entry was the Gaston Road intersection.  If
Ladson entered the freeway from Gaston Road, he most likely was driving
southbound on Gaston when it intersected and terminated at an access road. 
Contrary to signage, Ladson then turned left, driving eastbound on a westbound
access road.  Contrary to signage, Ladson continued east on the access road
until, contrary to traffic reflectors, he entered the exit ramp of the
freeway.  Ladson then proceeded another eight and one half miles against
oncoming traffic until the fatal crash.

Despite the fact that Ladson was committing a criminal act
when the crash occurred, appellees contend the Texas Department of
Transportation (“the department”) is liable for their damages because the
department could have done more to prevent Ladson from entering the tollway by
relocating certain signage, adding traffic lights, etc.  It is hard to imagine,
however, a greater indication of error than eight and one half miles of
opposing headlights on a divided highway.

The only reason I can discern for the department’s inclusion
in this litigation is its “deep pockets,” and there are no pockets deeper than
the public treasury which can be resupplied by seemingly endless amounts of
tax-payer dollars.  Accordingly, this case illustrates both the wisdom and
necessity of sovereign immunity.




 

The Doctrine of Sovereign Immunity

            In recent years the doctrine of sovereign immunity has fallen
into disfavor.[2] 
It has been characterized as “archaic,”[3]
“feudal,”[4]
“primitive,”[5]
“absurd,”[6]
“a legal fiction,”[7]
and contrary to the public interest.[8]
At least one jurist has judged the doctrine to have “little relevance in the 21st
century.”[9]

The
King Can Do No Wrong

Ancient though the doctrine may be, it is neither primitive
nor contrary to public interest.  Although Blackstone has been pilloried for
justifying sovereign immunity on the “outmoded” [10]
medieval precept that “the King can do no wrong,”[11]
critics rarely grasp his meaning.[12] 
Professor Louis Jaffe and many other scholars are of the opinion that the
expression “the King can do no wrong” originally meant precisely the opposite of
how it is interpreted today.[13] 
Blackstone plainly states that the “ancient and fundamental maxim is not to be understood,
as if everything transacted by the government was of course just and lawful.”[14] 
When Blackstone spoke of “the king,” he spoke of the regal office, not an
individual.  Thus, the “king never dies,”[15]
he “is always present in all his courts,”[16]
and he “is incapable of doing wrong.”[17] 
In other words, as Professor Jaffe suggests, the king must not, was not
allowed, and was not entitled to do wrong.

As a proponent of natural law, Blackstone regarded “the Law” as
emanating from God, not government.  Thus, “the principal duty of the king is,
to govern his people according to law.”[18] 
Citing Henry de Bracton, Blackstone observed, the king “ought not to be subject
to man, but to God, and to the law, for the law maketh the king.”[19] 
Stated slightly differently, “the king also hath a superior, namely God, and
also the law, by which he was made a king.”[20] 
Thus, the unjust actions and edicts of a corrupt king, being not from God, were
not law.  Accordingly, a corrupt king could be defied, resisted, and even
overthrown precisely because “the king can do no wrong.”[21]

Oliver Wendell Holmes, who rejected Blackstone’s concept of
natural law, nevertheless agreed with Blackstone’s maxim, but for a very different
reason.  As a legal positivist, Holmes believed law was “posited” not by a
mythical god, but by the highest sovereign in existence—the state.  Holmes held
that a “sovereign is exempt from suit, not because of any formal conception or
obsolete theory, but on the logical and practical ground that there can be no
legal right as against the authority that makes the law on which the right
depends.”  Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S. Ct.
526, 527 (1907).  Accordingly, in Holmes’ view, the law is neither eternal
nor immutable; men have no inherent or inalienable rights; and “the king can do
no wrong” because, by virtue of his political and military power, the king is
sovereign and, thus, has the prerogative to define right and wrong until such
time as he is supplanted by one stronger than himself.

Notwithstanding their opposing world views (natural law
versus legal positivism), both Holmes and Blackstone recognized the practical
limitations of suing the sovereign for there is no higher authority before whom
one can prosecute an appeal.  Further, it is of no consequence that we live
under a republic rather than a monarchy.  No writ or appeal, for example, may
be brought against the United States Supreme Court.  While that tribunal
undoubtedly errs (and some believe quite frequently), yet there is no higher tribunal
to which one can appeal.  Thus, the Supreme Court enjoys, in a very real sense,
sovereign immunity. Thrown 

Moreover, even when a sovereign “waives” its immunity, as
Texas has done to a limited degree under the Texas Tort Claims Act, the waiver
is largely illusory.  The courts of this state are no less the “State of Texas”
(i.e., the sovereign) than is the governor or legislature.  Thus, in reality,
there is no higher authority before which the aggrieved citizen can bring his
appeal.  In this sense, the state must, of logical necessity, remain immune.

Actions
Against the Sovereign

Originally, when a person suffered injury or death at the hands of
another, he or his kin had a right of “private war” against the offender.[22] 
These wars, however, had a tendency to escalate.

The injured kin would avenge its wrong not merely on
the person of the slayer, but on his belongings.  It would have life or lives
for life, for all lives were not of equal value; six ceorls must perish to
balance the life of one thegn.[23]

Thus, the blood-feud was both common and immensely destructive.  “Private
war” damaged the peace of the king’s realm.  An orderly, productive society was
impossible while such conflicts raged.  However, in time, it was discovered an
offender could sometimes buy off the kin of his victim.  Money, every now and
then, soothes and satisfies the passion for revenge.

To preserve the peace, the kings of England, as well as other Germanic
tribes, encouraged a system of pecuniary compositions.

The offender could buy back the peace that he had
broken.  To do this he had to settle not only with the injured person but also
with the king: he must make bόt to the injured and pay a wíte
to the king.  . . . Gradually more and more offenses became emendable.[24]

Thus, the blood-feud could be prosecuted only if the offender failed to
pay the bόt (for injuries) or the wer (for homicide). In
other words, “the compensation recovered in the appeal was the alternative of
vengeance.”[25]

            Even unintended injuries were compensable under concepts of
vengeance.  Thus, if a man was gored by his neighbor’s ox, he was entitled to
take vengeance against the ox.[26] 
The owner of the ox was liable only to the extent of his ownership in the
offending chattel; thus, he was obliged to either surrender the ox or
compensate the injured man and thereby retain his interest in the ox.  Even
inanimate objects that caused injury or damage were subject to vengeance.  As
Holmes observed, we see this demonstrated when a civilized man kicks a door
that pinches his finger.[27] 
Thus, the common law action of trespass (seeking compensation for personal or
property damages whether intentionally or negligently inflicted) arose directly
out of the criminal law.[28] 
Moreover, all personal actions in civil law have subsequently grown out of
trespass.[29]

            Viewed in this light, actions against the sovereign seem
exceptionally inapt.  Such suits have no power to punish or deter as they would
if brought against an individual because the state pays with another’s money,
not its own.  No vengeance is achieved; no retribution is meted out.  Moreover,
a fundamental concept of our government is that the people are
sovereign and possess all
of the powers of sovereignty.  Byers v. Patterson, 219 S.W.3d 514,
521 (Tex. App.—Tyler 2007, no pet.).  Thus, an action against the sovereign
“is in effect suing oneself, which is a legalistic anomaly.”  Ace Flying Serv., Inc. v. Colo. Dep’t of Agric., 136
Colo. 19, 24, 314 P.2d 278, 281 (1957).  Since sovereignty rests in the
people collectively, one person has no authority to elevate his will over the
will of the many.  This is not to say that an individual can never be
compensated for wrongful injury negligently inflicted by the sovereign or its
agents, for even in Blackstone’s day there was recompense.

Despite the fact that the king could do no wrong and was absolutely
immune from suit, an individual who suffered injury inflicted by the crown
could seek redress from the king by numerous writs and common law actions.[30] 
One may wonder then in what manner the king was immune from suit.  Blackstone
continues:

And, first, as to private injuries; if any person has,
in point of property, a just demand upon the king, he must petition him in his
court of chancery, where his chancellor will administer right as a matter of
grace, though not upon compulsion.  And this is entirely consonant to what is
laid down by the writers on natural law.  “A subject, says Puffendorf, so long
as he continues a subject, hath no way to oblige his prince to give him
his due, when he refuses it; though no wise prince will ever refuse to stand to
a lawful contract.  And, if the prince gives the subject leave to enter an
action against him, upon such contract, in his own courts, the action itself
proceeds rather upon natural equity, than upon the municipal laws.”  For the
end of such action is not to compel the prince to observe the contract,
but to persuade him.[31]

    Likewise, in a democratic republic, a person allegedly suffering
injury due to state action or negligence cannot bring suit without the consent
of the sovereign, i.e., the people.  Further, the people do not speak through
the written opinions of their judges, nor are we endowed with some “divine
right” to unilaterally open the coffers of state government.  The people speak
through their constitution and legislative enactments.  Thus, we must look to
what extent and under what circumstances the people have consented to be sued.

Texas Tort Claims Act

            Apart from specific legislative action in individual cases, sovereign
immunity has been partially waived by the Texas Tort Claims Act.  Tex. Civ. Prac.
& Rem. Code Ann. § 101.025 (Vernon 2005).  The tort claims act waives
sovereign immunity for death caused by a condition or use of tangible personal
or real property if the governmental unit would, were it a private person, be
liable to the claimant according to Texas law.  Id. § 101.021(2) (Vernon
2005).  But, sovereign immunity is expressly reserved in claims arising from
the failure of a governmental unit initially to place a traffic or road
sign, signal, or warning device if the failure is a result of discretionary
action of the governmental unit.  Id. § 101.060(a)(1) (Vernon 2005). 
However, once a sign or signal is installed, “the absence, condition, or
malfunction of a traffic or road sign, signal, or warning device [is
actionable] unless the absence, condition, or malfunction is not corrected by
the responsible governmental unit within a reasonable time after notice.”  Id.
§ 101.060(a)(2) (Vernon 2005).[32]

Quality
and Sufficiency of the Traffic Control Devices

            The appellees first contend the department was negligent in
that it failed to install sufficient signs, lights, and traffic control devices
to prevent Ladson from improperly entering the tollway.  The majority correctly
surmises that all decisions regarding whether, when and why traffic control
devices should be installed are discretionary decisions protected by sovereign
immunity.  However, the majority remands this cause to allow appellees to amend
their pleadings, if possible, to allege “non-discretionary” acts by the department
that resulted in injury and, thus, are not protected by sovereign immunity.

The majority does not suggest, and I cannot fathom, what
“non-discretionary” acts are involved in deciding if, how, and when to install
traffic signs and signals.  Thus, no purpose is gained by a remand other than
needlessly prolonging the litigation.  Accordingly, I dissent to the remand.

Negligent
Implementation

Appellees also charge the department negligently implemented
its decision to install traffic signs and devices by failing to place them in
the most advantageous positions.  The majority concludes the placement of
traffic control signs and devices is protected by sovereign immunity, but again
remands this cause to permit appellees to amend their pleadings to allege “whether
the traffic-control devices were inadequate, or the warning signs were
negligently located, because of TxDOT’s negligent implementation of the
construction plans.”

The precise placement of traffic signs and control devices to
achieve maximum impact and advantage is subject to reasonable disagreement.  Without
sovereign immunity, every accident would be followed by a suit contending the
traffic sign should have been positioned “a few inches higher” or “a couple of
feet to the left.”  These are matters clearly left to the discretion of the
department and its engineers in the field.  Furthermore, there is not the
slightest suggestion of negligent implementation of construction plans in the
record and pleadings before us.  Accordingly, I dissent to the remand.

Maintenance

            Appellees contend some of the traffic buttons on the access
road and exit ramp were chipped and damaged.  These buttons possess white and
red reflectors.  When a driver is proceeding in the proper direction, the white
reflectors delineate the lanes of traffic.  When a driver is going in the wrong
direction, he is confronted with red warning reflectors.  Appellees suggest
that some of these reflectors were damaged and/or missing, and, thus, were not
properly maintained.  The tort claims act waives sovereign immunity where the
defective “condition . . . is not corrected by the responsible governmental
unit within a reasonable time after notice.”  Tex. Civ. Prac. & Rem. Code
Ann. § 101.060(a)(2).  The department asserts appellees have failed to allege
or show it had any notice of the alleged defect.  The majority rejects the
department’s position because it had the burden of establishing sovereign
immunity.  Relying on Tex. Dep’t of Parks & Wildlife v. Miranda, 133
S.W.3d 217, 228 (Tex. 2004), the majority contends the department was required
to assert and support with evidence its assertion that it had no notice of the
alleged defect.  Thus, the majority affirms the trial court’s denial of the
department’s plea to the jurisdiction on this issue.[33]

            Millions of traffic buttons have been installed on Texas
highways.  If liability can be imputed to the state because some buttons have
since been chipped or broken, it would have been better for the state (not the
travelling public) if they had never been installed.  Whether the traffic
buttons on the access road at issue were in need of maintenance has not been
established.  Here, the department alleged in its plea to the jurisdiction that
if the traffic buttons were in need of repair (which it did not concede), the
appellees failed to allege or show it had knowledge of the danger.  Indeed, one
has to wonder how many times department employees are assigned to drive the
wrong way at night on a one-way street to test the efficacy of the traffic
buttons.  Moreover, even a sober citizen who found himself driving the wrong
way on a one-way street would not likely make a “button” report to the
department.  Here, the department did all it could do; it raised the issue
before the trial court.

By holding the department was required to prove the
non-existence of an event, the majority stands Miranda on its head.  In Miranda,
the court sought to protect “the interests of the state and . . .
injured claimants.”  Miranda, 133 S.W.3d at 228 (emphasis added).  Here,
the majority asks the state to prove a negative or waive its sovereign
immunity.  If the plaintiffs possess evidence that the department was notified
prior to the accident that the traffic buttons were in disrepair, it is not
unreasonable to expect them to allege and prove such facts.  Accordingly, I
dissent.

Negligent
Implementation of Tollway Policy

            Appellees contend the department negligently failed to
implement its policy to safely operate the tollway when it did not erect
traditional toll booths and wider road shoulders.  Appellees argue that if
traditional toll booths had been erected on the exit ramps, Ladson might not
have been able to enter the westbound lanes.  The majority remands this claim
to permit the appellees to amend their pleadings, if possible, to allege that
the failure to build toll booths and wider road shoulders constituted a
negligent implementation of construction plans.

The Texas Tort Claims Act does not waive sovereign immunity
for roadway design.  Tex. Dep’t of Transp. v. Ramirez, 74 S.W.3d 864, 867
(Tex. 2002).  The decision to install or not install traditional toll booths or
wider shoulders was a matter of roadway design.  Moreover, there is not the
slightest suggestion of negligent implementation of construction plans in the
record and pleadings before us.  Accordingly, I dissent to the remand of this
issue.

Joint
Enterprise

            Finally, appellees assert the department is liable under a
“joint enterprise” theory.  Under Texas law a joint enterprise, as that term is
used in the law of negligence, signifies a legal relationship between two or
more parties that imposes the responsibility upon each joint venturer for the
negligent acts of the other while acting in furtherance of their common
undertaking.  Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp., 28
S.W.3d 64, 67 (Tex. App.―Texarkana 2000, no pet.).  Thus, appellees argue that by
virtue of a joint enterprise agreement among the department, the Fort Bend
County Toll Road Authority, the Harris County Toll Road Authority, Fort Bend
County, Harris County, and Michael Stone Enterprises, the department is liable
for the negligent conduct of any and all members of the enterprise.

            For its part, in its plea to the jurisdiction, the department
submitted two agreements: (1) a contract between Harris County and Fort Bend
County; and (2) a contract between the department and the Fort Bend County Toll
Road Authority.  These agreements simply provide for the construction of the
roadway; they make no provision for revenue sharing or the operation of the
toll road. However, to establish a joint enterprise, the plaintiff must show: “(1)
an agreement, express or implied, among the members of the group; (2) a common
purpose to be carried out by the group; (3) a community of pecuniary
interest in that purpose, among the members; and (4) an equal right to a
voice in the direction of the enterprise, which gives an equal right of
control.  Tex. Dep’t of Transp. v. Able, 35 S.W.3d 608, 613 (Tex. 2000)
(emphasis added).

            The majority nevertheless holds the department “has not conclusively
negated” appellees’ allegation that other express or implied agreements
existed.  (Emphasis added).  Thus, the majority affirms the trial court’s
denial of the department’s plea to the jurisdiction on this issue.[34]

            Once again, I am perplexed as to how the department might go
about proving the non-existence of alleged contracts.  In my view, the
department did all it could to raise, sharpen, and clarify the issue.  It
denied the existence of any agreements save two which it submitted to the trial
court.  What more could it have done?  If appellees are aware of any
additional agreements, it was incumbent upon them to offer the documents or
evidence in rebuttal.

            For these reasons, I concur with the majority’s dismissal of
appellees’ joint enterprise theory of liability against Fort Bend County Toll
Road Authority and respectfully dissent to all other aspects of the decision. 

 

                                                                                                                                                                                                                                                

                                                                        /s/        J.
Harvey Hudson

                                                                                    Senior
Justice

 

Panel consists of Chief Justice
Hedges, Justice Seymore, and Senior Justice Hudson.*









[1]
Ladson’s blood alcohol was three times the legal limit.





[2]
Principe Compania Naviera, S. A. v. Bd. of Comm’rs of Port of New Orleans,
333 F. Supp. 353, 355 (E.D. La. 1971).

 





[3]
Granite Valley Hotel Ltd. P’ship v. Jackpot Junction Bingo & Casino,
559 N.W.2d 135, 162 (Minn. Ct. App. 1997) (Randall, J., concurring).

 





[4]
Nevada v. Hall, 440 U.S. 410, 415, 99 S. Ct.
1182, 1185 (1979).

 





[5]
City of Danville v. Smallwood, 347 S.W.2d 516, 518 (Ky. 1961).

 





[6]
Haynes v. Franklin, 95 Ohio St. 3d 344, 2002-Ohio-2334, 767 N.E.2d
1146 , at ¶ 31 (Pfiefer, J., dissenting).

 





[7]
Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 848 (Tenn. 2008).

 





[8]
State ex rel. Hanosh v. State ex rel. King, 2009-NMSC-047, ¶ 11, 147
N.M. 87, 217 P.3d 100.

 





[9]
Blessing v. Nat’l Eng’g & Contracting Co., 664 S.E.2d 152,
160 (W.Va. 2008) (Benjamin, J., concurring).

 





[10]
Dairyland Ins. Co. v. Bd. of County Comm’rs of Bernalillo County, 88
N.M. 180, 181, 538 P.2d 1202, 1203 (N.M. Ct. App. 1975).

 





[11]
3 William Blackstone, Commentaries 254.

 





[12]
It is the habit of men, like their canine companions, to “always bark at those
they know not, and . . . it is their nature to accompany one another in those
clamors.”  Sir Walter Raleigh, Preface to the History of the World, in
The Harvard Classics 67 (Charles W. Eliot. ed., 1969).

 





[13]
Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity,
77 Harv. L. Rev. 1, 4 (1963).  This evolution of contradictory meanings is best
described by Justice Frankfurter, “A phrase begins life as a literary
expression; its felicity leads to its lazy repetition; and repetition soon
establishes it as a legal formula, undiscriminatingly used to express different
and sometimes contradictory ideas.” Tiller v. Atlantic Coast Line R. Co.,
318 U.S. 54, 68, 63 S. Ct. 444, 452 (1943) (Frankfurter, J., dissenting).

 





[14]
1 Blackstone, Commentaries 238–39.

 





[15]
Id. at 242.

 





[16]
Id. at 260.

 





[17]
Id. at 239.

 





[18]
Id. at 226.

 





[19]
Id. at 227.

 





[20]
Id.

 





[21]
I recognize that some have concluded the doctrine of sovereign immunity is
obsolete because it “was rejected by the colonists when they declared their
independence from the Crown.”  See Hall, 440 U.S. at 415, 99 S. Ct. at
1185.  Nothing could be further from the truth.

The Declaration of Independence
is an articulate justification and defense for revolution under principles of
natural law.  Jefferson argues that it is “the laws of nature and of nature’s
God” that entitled the colonists to ignore the edicts of the king.  As
Blackstone stated:

This
law of nature, being co-eval with mankind and dictated by God himself, is of
course superior in obligation to any other.  It is binding over all the globe,
in all countries, and at all times: no human laws are of any validity, if
contrary to this; and such of them as are valid derive all their force, and
all their authority, mediately or immediately, from this original.

1 Blackstone, Commentaries 41 (emphasis added). 
Thus, when a king oppresses his subjects contrary to the just principles of
natural law, Blackstone argues he is deemed to have abdicated the throne
because the king can do no wrong.  Id. at 238.

                Nothing in our Declaration of
Independence repudiates the doctrine of sovereign immunity.





[22]
See Hugo Grotius, On the Law of War and Peace 34–35 (Kessinger
2004).

 





[23]
2 Sir Frederick Pollock & Frederic William Maitland, The History of
English Law 450 (2d ed. Cambridge 1899).

 





[24]
Id. at 451.

 





[25]
O. W. Holmes, Jr., The Common Law 2–3 (1881).





[26]
Id. at 7–10.

 





[27]
Id. at 11.

 





[28]
F. W. Maitland, The Forms of Action at Common Law 48–49 (Cambridge
1948).

 





[29]
Id. at 65.

 





[30]
3 Blackstone, Commentaries 254–69.

 





[31]
1 Blackstone, Commentaries 236.





[32]
While it is the legislature’s prerogative to do so, it appears the statute is
contrary to public interest in that it encourages the state to install no
traffic signs, warning lights or control devices.  So long as the state takes
no action to protect the public, it is immune from suit.  However, if the state
installs a traffic sign or control device and fails to keep it properly
maintained, it is subject to liability.  Thus, the state installs traffic
safety devices at its peril.





[33]
The majority ultimately determines that appellees failed to allege a required
element of their claim concerning traffic buttons and remands for a reasonable
opportunity to remedy such deficiency. 





[34]
The majority here and in the companion case, Fort Bend County Toll Road
Authority v. Zuleima Olivares, et al., ___ S.W.3d ___, (Tex. App.―Houston [14th Dist.]
2010), concludes that statute bars joint enterprise liability against the Fort Bend
County Toll Road Authority.  Thus, the majority dismisses appellees’ joint
enterprise theory of liability against the authority for want of jurisdiction. 
I concur in this result.

 





* Senior Justice J. Harvey Hudson sitting
by assignment.