1 IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

 2 Opinion Number:______________

 3 Filing Date: March 13, 2017

 4 NO. S-1-SC-35214

 5 KIMBERLY MONTAÑO,

 6 Plaintiff-Respondent,

 7 v.

 8 ELDO FREZZA, M.D.,

 9 Defendant-Petitioner,

10 and

11 LOVELACE INSURANCE COMPANY,
12 a Domestic For-Profit Corporation,

13 Defendant.

14 and

15 NO. S-1-SC-35297

16 KIMBERLY MONTAÑO,

17 Plaintiff-Petitioner,

18 v.

19 ELDO FREZZA, M.D.,

20 Defendant-Respondent,
 1 and

 2 LOVELACE INSURANCE COMPANY,
 3 a Domestic For-Profit Corporation,

 4 Defendant.

 5 ORIGINAL PROCEEDING ON CERTIORARI
 6 C. Shannon Bacon, District Judge

 7 Hinkle Shanor LLP
 8 William P. Slattery
 9 Dana Simmons Hardy
10 Santa Fe, NM

11 Office of the Attorney General of Texas
12 John Campbell Barker, Deputy Solicitor General
13 Lisa A. Bennett, Assistant Solicitor General
14 Jose L. Valtzar, Assistant Attorney General
15 Austin, TX

16 for Petitioner Eldo Frezza, M.D.

17 Jones, Snead, Wertheim & Clifford, P.A.
18 Jerry Todd Wertheim
19 Roxie P. Rawls-De Santiago
20 Samuel C. Wolf
21 Santa Fe, NM

22 for Petitioner Kimberly Montaño

23 Windle Hood Norton Brittain & Jay, LLP
24 Joseph L. Hood, Jr.
25 El Paso, TX

26 for Amicus Curiae University of Texas System
 1 Atwood, Malone, Turner & Sabin, P.A.
 2 Lee M. Rogers Jr.
 3 Quincy J. Perales
 4 Roswell, NM

 5 for Amici Curiae Texas Medical Liability Trust, et al.

 6 Lorenz Law
 7 Alice Tomlinson Lorenz
 8 Albuquerque, NM

 9 Hull Hendricks LLP
10 Michael S. Hull
11 Austin, TX

12 for Amici Curiae New Mexico Medical Society, et al.

13 Garcia Ives Nowara, LLC
14 George L. Bach, Jr.
15 Albuquerque, NM

16 for Amicus Curiae New Mexico Trial Lawyers Association
 1 OPINION

 2 CHÁVEZ, Justice.

 3 {1} Can a New Mexico resident who has been injured by the negligence of a state-

 4 employed Texas surgeon name that surgeon as a defendant in a New Mexico lawsuit

 5 when Texas sovereign immunity laws would require that the lawsuit be dismissed?

 6 The answer to this question implicates principles of interstate comity, an issue that

 7 we have previously examined in Sam v. Sam, 2006-NMSC-022, 139 N.M. 474, 134

 8 P.3d 761. Sam set forth guidelines for a court to assess when determining whether

 9 and to what extent it should recognize another state’s sovereign immunity as a matter

10 of comity. We initially presume that comity should be extended because cooperation

11 and respect between states is important. However, this presumption is overcome and

12 a New Mexico court need not fully extend comity if the sister state’s law offends New

13 Mexico public policy. In this case, we apply the Texas provision requiring that the

14 case against the surgeon be dismissed because doing so does not contravene any

15 strong countervailing New Mexico public policy.

16 I. BACKGROUND

17 {2} The background facts are taken from the complaint because when reviewing

18 a motion to dismiss, we must “accept as true all well-pleaded factual allegations in

19 the complaint and resolve all doubts in favor of the complaint’s sufficiency.” N.M.
 1 Pub. Sch. Ins. Auth. v. Arthur J. Gallagher & Co., 2008-NMSC-067, ¶ 11, 145 N.M.

 2 316, 198 P.3d 342.

 3 {3} Kimberly Montaño, a New Mexico resident, sought bariatric surgery for her

 4 obesity in early 2004. At that time Eldo Frezza, M.D. was the only doctor from

 5 whom Montaño could receive that surgery and still be covered by her insurer.

 6 Montaño believed that she needed the procedure and that she could not afford it

 7 without medical insurance coverage.

 8 {4} Dr. Frezza was employed as a bariatric surgeon and professor and served as

 9 chief of bariatric surgery at Texas Tech University Health Sciences Center (Texas

10 Tech Hospital) in Lubbock, Texas from June 2003 to August 2008. Texas Tech

11 Hospital is a governmental unit of the State of Texas. See United States v. Tex. Tech

12 Univ., 171 F.3d 279, 289 n.14 (5th Cir. 1999) (“The Eleventh Amendment cloaks

13 Texas Tech University and Texas Tech University Health Sciences Center with

14 sovereign immunity as state institutions.”). The parties do not dispute that Dr. Frezza

15 was acting within the scope of his employment at Texas Tech Hospital when he

16 provided care to Montaño.

17 {5} On February 3, 2004, Dr. Frezza performed laparoscopic gastric bypass surgery

18 on Montaño at Texas Tech Hospital. Montaño began to suffer from abdominal pain

 2
 1 at some unspecified time following the procedure. She returned to see Dr. Frezza

 2 several times. He told her that some discomfort was normal and assured her that

 3 everything was ok. Montaño was also admitted to various medical centers on

 4 multiple occasions for severe abdominal pain.

 5 {6} Six years after the surgery was performed, Montaño was admitted to Covenant

 6 Health System in Lubbock, Texas, where Dr. David Syn performed an

 7 esophagogastroduodenoscopy to determine the cause of her pain. Dr. Syn determined

 8 that the 2004 surgery performed by Dr. Frezza had left a tangled network of sutures

 9 in Montaño’s gastric pouch and down the jejunal limb, which Dr. Syn diagnosed as

10 the cause of her constant severe abdominal pain. Dr. Syn then performed a revision

11 of the gastric bypass procedure that had been performed by Dr. Frezza.

12 {7} In October 2011, Montaño filed a medical malpractice complaint in New

13 Mexico naming Dr. Frezza as a defendant. Montaño alleged three separate causes of

14 action against Dr. Frezza, claiming that he committed medical negligence and misled

15 her regarding the risks of the procedure and the cause of her pain.

16 {8} Dr. Frezza filed a motion to dismiss Montaño’s complaint under Rule 1-

17 012(B)(6) NMRA for failure to state a claim upon which relief could be granted.1 Dr.

18 1
 Dr. Frezza also filed a separate motion to dismiss, claiming that the district
19 court lacked personal jurisdiction, an issue which is not before us.

 3
 1 Frezza argued, in part, that the district court should (1) recognize and apply the Texas

 2 Tort Claims Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001 to -.109 (1985, as

 3 amended through 2015) (TTCA) under principles of comity, and (2) dismiss the suit

 4 because Texas law prohibits suits against individual governmental employees and

 5 requires courts to dismiss such suits unless the plaintiff substitutes the governmental

 6 employer of the employee within thirty days of the motion. TTCA § 101.106(f).

 7 {9} The district court declined to extend comity and denied Dr. Frezza’s motion to

 8 dismiss, finding that it would violate New Mexico public policy to apply Texas law

 9 to Montaño’s claims. The Court of Appeals affirmed on this issue. Montaño v.

10 Frezza, 2015-NMCA-069, ¶¶ 39, 41-42, 352 P.3d 666.

11 {10} Montaño and Dr. Frezza each petitioned this Court for a writ of certiorari. Dr.

12 Frezza asked us to review whether Texas law should be applied to this case under

13 either New Mexico choice of law rules or comity. In turn, Montaño asked that we

14 review the scope of the Court of Appeals’ application of New Mexico law. We

15 granted both petitions.2 Montaño v. Frezza, 2015-NMCERT-006.

16 II. COMITY

17 {11} This case implicates Texas’ sovereign immunity, and therefore it might be

18 2
 Because our comity analysis resolves this case, we do not address the other
19 issues raised by the parties.

 4
 1 resolved through principles of comity. Comity is a doctrine under which a sovereign

 2 state chooses to recognize and apply the law of another sovereign state. Sam,

 3 2006-NMSC-022, ¶ 8. The United States Supreme Court has long referred to a broad

 4 presumption of comity between the states that reflects states’ unique relationship

 5 within the federal system. See Nevada v. Hall, 440 U.S. 410, 425 (1979) (“In the

 6 past, this Court has presumed that the States intended to adopt policies of broad

 7 comity toward one another.”); see also Bank of Augusta v. Earle, 38 U.S. (13 Pet.)

 8 519, 590 (1839) (“The intimate union of these states, as members of the same great

 9 political family; the deep and vital interests which bind them so closely together;

10 should lead us, in the absence of proof to the contrary, to presume a greater degree

11 of comity, and friendship, and kindness towards one another, than we should be

12 authorized to presume between foreign nations.”).

13 {12} We have held that comity should be extended unless doing so would undermine

14 New Mexico’s own public policy. Sam, 2006-NMSC-022, ¶ 21; see also Hall, 440

15 U.S. at 422 (“[T]he Full Faith and Credit Clause does not require a State to apply

16 another State’s law in violation of its own legitimate public policy.”). The law of the

17 sister state must not only contravene New Mexico public policy, but be “sufficiently

18 offensive” to that policy “to outweigh the principles of comity.” Sam, 2006-NMSC-

 5
 1 022, ¶ 19; see also Leszinske v. Poole, 1990-NMCA-088, ¶¶ 20-35, 110 N.M. 663,

 2 798 P.2d 1049 (concluding that New Mexico’s public policy of prohibiting a

 3 marriage between an uncle and a niece did not outweigh the principles of comity

 4 towards a foreign sovereign and the desirability of uniform recognition of marriages).

 5 {13} Therefore, public policy lies at the heart of our comity analysis. We have

 6 previously recognized that “it is the particular domain of the legislature, as the voice

 7 of the people, to make public policy,” and courts should interpret public policy “with

 8 the understanding that any misperception of the public mind [by courts] may be

 9 corrected shortly by the legislature.” Torres v. State, 1995-NMSC-025, ¶ 10, 119

10 N.M. 609, 894 P.2d 386. As a result, we approach the comity analysis with a healthy

11 respect for our Legislature’s role as “[t]he predominant voice behind the declaration

12 of [New Mexico] public policy” and with careful attention to legislative enactments

13 embodying our state’s policy choices. Hartford Ins. Co. v. Cline, 2006-NMSC-033,

14 ¶ 8, 140 N.M. 16, 139 P.3d 176.

15 {14} Sam is the seminal New Mexico case with respect to the comity issues

16 presented here. To determine whether it was appropriate to extend comity and fully

17 enforce another state’s sovereign immunity provisions in that case, we examined four

18 factors: “(1) whether the forum state would enjoy similar immunity under similar

 6
 1 circumstances, (2) whether the state sued has or is likely to extend immunity to other

 2 states, (3) whether the forum state has a strong interest in litigating the case, and (4)

 3 whether extending immunity would prevent forum shopping.” 2006-NMSC-022, ¶

 4 22 (citations omitted). These factors are guidelines that assist courts in answering the

 5 ultimate question of whether extending comity would violate New Mexico public

 6 policy. See id.

 7 A. Standard of Review

 8 {15} We apply a mixed standard of review to questions of comity. Id. ¶ 9. While

 9 a district court’s decision to extend comity in a given case is subject to de novo

10 review, we also analyze any fact-intensive aspects of the district court’s comity

11 analysis under a more deferential abuse of discretion standard. Id. ¶ 12. We agree

12 with Dr. Frezza that the district court’s refusal to apply Texas law under principles

13 of comity in this case was not fact-intensive, but instead focused on comparing the

14 public policies of Texas and New Mexico as expressed in each state’s tort claims act.

15 Because public policy questions “require[] us to consider legal concepts in the mix

16 of fact and law and to exercise judgment about the values that animate legal

17 principles,” we review public policy determinations de novo. State v. Attaway,

18 1994-NMSC-011, ¶ 6, 117 N.M. 141, 870 P.2d 103 (internal quotation marks and

 7
 1 citations omitted), holding modified on other grounds by State v. Lopez,

 2 2005-NMSC-018, ¶¶ 17-18, 138 N.M. 9, 116 P.3d 80; see also Ponder v. State Farm

 3 Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 6, 129 N.M. 698, 12 P.3d 960 (stating that

 4 “matters of public policy with broad precedential value” are properly subject to de

 5 novo review (internal quotation marks and citations omitted)). We now explain the

 6 factors set forth in Sam and apply them to this case.

 7 B. The First Sam Factor: Comparing the Immunity Provisions of Each State

 8 {16} Under the first Sam factor, we consider “whether the forum state would enjoy

 9 similar immunity under similar circumstances.” 2006-NMSC-022, ¶ 22. We make

10 this determination by examining whether “a similar action brought against a New

11 Mexico entity or government employee would be barred” under the New Mexico Tort

12 Claims Act, NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2015)

13 (NMTCA). Sam, 2006-NMSC-022, ¶¶ 22-23; see also Franchise Tax Bd. of Cal. v.

14 Hyatt, 538 U.S. 488, 499 (2003) (concluding that a state may rely on the contours of

15 its own sovereign immunity from suit as a benchmark for its comity analysis). If we

16 determine that a similar action would not be barred under the NMTCA, then we must

17 look to the other three Sam factors and consider the public policy implications of

18 extending comity in this case. Thus, the first Sam factor serves as a threshold inquiry

 8
 1 because if the result would not be different under New Mexico law, then it would not

 2 offend New Mexico public policy to apply the other state’s law, and there is no need

 3 to examine the other Sam factors.

 4 {17} Further, the Full Faith and Credit Clause of the United States Constitution, U.S.

 5 Const. art. IV, § 1, requires us to recognize the sovereign immunity of other states to

 6 the extent that sovereign immunity has been retained by this state under our law. See

 7 Franchise Tax Bd. of Cal. v. Hyatt, ___ U.S. ___, ___, 136 S. Ct. 1277, 1282-83

 8 (2016). Otherwise we would be espousing an impermissible “special and

 9 discriminatory rule[]” reflecting a “policy of hostility to the public Acts of a sister

10 State.” Id. (internal quotation marks and citations omitted). Therefore we must, at

11 a minimum, recognize any immunity retained by Texas under the TTCA that is not

12 inconsistent with the immunity retained by New Mexico under the NMTCA.

13 {18} Dr. Frezza’s motion to dismiss raised TTCA Section 101.106(f) as the only

14 basis for dismissing Montaño’s suit. TTCA Section 101.106(f) clarifies that a suit

15 filed against a governmental employee “based on conduct within the general scope

16 of that employee’s employment . . . is considered to be against the employee in the

17 employee’s official capacity only.” See also TTCA § 101.026 (stating that a

18 governmental employee’s individual immunity from a tort claim is not affected by the

 9
 1 TTCA). Further, on the employee’s motion, the suit against the employee must be

 2 dismissed within thirty days unless the plaintiff amends his or her pleadings to

 3 dismiss the employee and name the governmental unit as a substitute defendant.

 4 TTCA § 101.106(f).

 5 {19} Montaño has not disputed that Dr. Frezza was acting within the scope of his

 6 employment when he provided care to her. Montaño did not amend her pleadings

 7 within thirty days of January 13, 2012, when Dr. Frezza filed his motion to dismiss.

 8 Because TTCA Section 101.106(f) applies to this case, Texas courts would have

 9 dismissed the suit against Dr. Frezza. See Franka v. Velasquez, 332 S.W.3d 367, 385

10 (Tex. 2011) (dismissing a suit under TTCA Section 101.106(f) that was brought

11 against state-employed physicians, even regarding claims for which the governmental

12 unit had not waived its immunity).

13 {20} Applying New Mexico law to this case would not require the dismissal of Dr.

14 Frezza as a defendant. Under the NMTCA, if Dr. Frezza were employed by a New

15 Mexico governmental employer, Montaño’s suit against Dr. Frezza could proceed

16 because individual governmental employees can be named as defendants. See § 41-4-

17 2(A) (establishing that “governmental entities and public employees” can be held

18 liable within the limitations set forth by the NMTCA); § 41-4-10 (stating that health

 10
 1 care providers can be liable under the NMTCA for injuries caused by negligence in

 2 the provision of health care services). Because immunity under New Mexico law

 3 would not be similar under similar circumstances, we must examine the other Sam

 4 factors to determine whether the application of Texas law in this case would offend

 5 New Mexico public policy.

 6 C. The Second Sam Factor: Gauging Past Cooperation Between the States

 7 {21} Under the second Sam factor, we determine whether Texas “has or is likely to

 8 extend immunity to other states.” 2006-NMSC-022, ¶ 22. This factor requires us to

 9 assess the degree of reciprocity and cooperation between Texas and other states, New

10 Mexico in particular. Cf. Hilton v. Guyot, 159 U.S. 113, 210 (1895) (noting the lack

11 of reciprocity indicated by France’s refusal to recognize foreign judgments as a factor

12 weighing against extending comity to a judgment from a French court). In the

13 absence of any indication that Texas has refused to grant immunity to New Mexico

14 or any other state under circumstances that are similar to this case, we assume that

15 Texas would extend comity to New Mexico to encourage future cooperation and

16 reciprocity between our states. See Sam, 2006-NMSC-022, ¶ 24.

17 {22} Several recent cases indicate that Texas has acted in a spirit of reciprocity and

18 cooperation toward New Mexico and other states in similar circumstances. First, in

 11
 1 New Mexico State University v. Winfrey, a Texas plaintiff brought a claim alleging

 2 negligent operation of a weather balloon against New Mexico State University and

 3 a university employee. 2011 WL 3557239, at *1 (Tex. App., Aug. 11, 2011).3 The

 4 Winfrey court compared the jurisdiction and venue provisions of the NMTCA and the

 5 TTCA and determined that the provisions were similar, such that enforcement of the

 6 NMTCA venue provision through comity would not violate Texas public policy. Id.

 7 at *2. The court then applied the NMTCA provision and dismissed the suit for lack

 8 of jurisdiction. Id. at *3-4; see also New Mexico v. Caudle, 108 S.W.3d 319, 320-22

 9 (Tex. App. 2002) (declining to determine the constitutionality of a New Mexico

10 statute under principles of comity).

11 {23} Second, Texas appellate courts have previously extended comity and applied

12 tort claims provisions from other jurisdictions that differed from the TTCA’s

13 provisions. For instance, in Greenwell v. Davis, the Texas Court of Appeals extended

14 sovereign immunity to an Arkansas city by applying Arkansas law to a tort action

15 arising from a car accident in the border city of Texarkana, Texas. 180 S.W.3d 287,

16 290, 296-99 (Tex. App. 2005). Arkansas law capped liability to the extent that the

17 3
 Although Winfrey was a memorandum opinion, we treat Winfrey as
18 precedential authority because memorandum opinions in civil cases issued after 2003
19 have precedential value in Texas. See Tex. R. App. Proc. 47.2(c), cmt. (2008).

 12
 1 governmental unit was covered by liability insurance, while Texas law capped

 2 liability for personal injuries at $250,000. Id. at 291-92. If Arkansas law had applied

 3 in that case, the plaintiff’s remedy would have been capped at $20,000, which was

 4 less than one-tenth of the cap under Texas law. Id. at 292. The court acknowledged

 5 this substantial difference in potential recoveries, but nonetheless held that it would

 6 not offend Texas public policy to apply the Arkansas immunity provision. Id. at 298;

 7 see also Hawsey v. La. Dep’t of Soc. Servs., 934 S.W.2d 723, 726-27 (Tex. App.

 8 1996) (applying under comity a mandatory venue provision for suits against the

 9 sovereign under Louisiana law that differed from the Texas venue provision).

10 {24} Montaño does not cite a single Texas authority suggesting that Texas has been

11 uncooperative with New Mexico or other states under circumstances similar to this

12 case. Instead, she invites us to analyze this factor by considering only whether Texas

13 would extend comity in situations where it would be contrary to Texas public policy

14 to do so. We decline Montaño’s invitation because the primary concern of the second

15 Sam factor is the existing history of cooperation and mutuality, or lack thereof,

16 between Texas and other states, which her proposed approach would not address. See

17 2006-NMSC-022, ¶ 19 (“Comity refers to the spirit of cooperation in which a

18 domestic tribunal approaches the resolution of cases touching the laws and interests

 13
 1 of other sovereign states.” (internal quotation marks and citations omitted)); see also

 2 K.D.F. v. Rex, 878 S.W.2d 589, 593 (Tex. 1994) (“Comity is a doctrine grounded in

 3 cooperation and mutuality.”). Because there is no indication that Texas has adopted

 4 an uncooperative attitude towards other states, we conclude that there is no public

 5 policy problem with extending comity to Texas under this factor.

 6 D. The Third Sam Factor: Balancing the States’ Interests

 7 {25} Under the third Sam factor, we consider whether New Mexico has a strong

 8 interest in litigating this case under New Mexico law by comparing the policy

 9 interests of New Mexico and Texas. See 2006-NMSC-022, ¶¶ 22, 26. If New

10 Mexico has a stronger interest in the case, then it may violate our public policy to

11 defer to Texas’ laws. However, if the interests of Texas are greater than New

12 Mexico’s, extending comity would not violate our public policy. The dissent

13 contends that our analysis of the third Sam factor should be guided by the United

14 States Supreme Court’s decision to abandon a balancing approach. Dissenting op.

15 ¶ 41. We decline to do so because the United States Supreme Court’s abandonment

16 of the balancing approach applies only to that Court’s analysis of whether a state’s

17 choice-of-law decision complies with the Full Faith and Credit Clause. Our comity

18 analysis is a broader inquiry meant to honor principles of interstate harmony and a

 14
 1 “spirit of cooperation” between states. Sam, 2006-NMSC-022, ¶ 19 (internal

 2 quotation marks and citation omitted). Here the district court held that “the State of

 3 New Mexico has equal or greater interest in litigating this matter than does the State

 4 of Texas.” We disagree.

 5 {26} Texas has a strong public policy interest in applying uniform standards of

 6 liability and immunity to the conduct of state-employed physicians who provide

 7 medical care at state-run facilities. New Mexico courts have recognized an analogous

 8 public policy interest with respect to this state’s governmental employees. In

 9 Wittkowski v. State, the Court of Appeals held that New Mexico public policy

10 required the application of New Mexico law to a suit alleging various breaches of

11 duty by officials of the New Mexico State Police and the New Mexico Department

12 of Corrections that allegedly caused the shooting of a liquor store employee in

13 Colorado. 1985-NMCA-066, ¶¶ 3-5, 8, 103 N.M. 526, 710 P.2d 93, overruled on

14 other grounds by Silva v. State, 1987-NMSC-107, ¶ 15, 106 N.M. 472, 745 P.2d 380.

15 The Wittkowski Court reasoned that because New Mexico had established the

16 standard of care governing the conduct of police officers and correctional officials

17 through the NMTCA and decisional law, New Mexico had a strong public policy

18 interest in determining “the existence of duties and immunities on the part of New

 15
 1 Mexico officials” sued for torts allegedly committed within the scope of their

 2 employment. 1985-NMCA-066, ¶ 8. Otherwise, uniformity in the law would be

 3 jeopardized because identical conduct by New Mexico officials could be deemed

 4 “actionable if the final act occurred in one state but not actionable if it occurred in

 5 another.” Id. In Torres, we adopted the Wittkowski Court’s description of New

 6 Mexico’s strong public policy interest for applying New Mexico law to tort actions

 7 against governmental officials for alleged acts or omissions occurring in New

 8 Mexico. Torres, 1995-NMSC-025, ¶ 14. We held in Torres that New Mexico law

 9 applied to a suit alleging breaches of duty by the Albuquerque Police Department

10 relating to police conduct in New Mexico that allegedly caused two shootings in

11 California. Id. ¶¶ 7, 14.

12 {27} The Court of Appeals later examined similar policy concerns with respect to

13 medical negligence claims. In Zavala v. El Paso County Hospital District, a young

14 girl’s family brought suit alleging medical malpractice and wrongful death by two

15 Texas doctors and a Texas state-run hospital where she had been transferred.

16 2007-NMCA-149, ¶¶ 1-3, 143 N.M. 36, 172 P.3d 173. Although the Court of

17 Appeals in Zavala did not need to apply a comity analysis, id. ¶ 40, the Court of

18 Appeals examined the competing policy interests of New Mexico and Texas in

 16
 1 adjudicating that case, id. ¶¶ 30-35, and determined that Texas had a “substantially

 2 stronger sovereignty interest” in resolving the case because the hospital was “not only

 3 located in Texas but it [was] also an entity of the government of the State of Texas,”

 4 id. ¶ 34. An almost identical policy interest is at stake in this case because Montaño’s

 5 lawsuit against Dr. Frezza relates to his conduct as a Texas state employee practicing

 6 medicine at a Texas state hospital.4

 7 {28} Further, although our analysis under the first Sam factor revealed that this

 8 lawsuit could be brought under the NMTCA but not the TTCA, we are not convinced

 9 that the relevant distinctions between the laws indicate any material differences in

10 public policy between the two states. Under both the NMTCA and the TTCA, a

11 governmental employee will not bear the cost of defending or paying damages for a

12 lawsuit arising from negligence committed by that employee within the scope of his

13 or her duties. Texas has chosen to forbid a lawsuit naming an individual employee,

14 but it still holds the governmental employer liable for its employee’s negligence.

15 TTCA §§ 101.106(f), 101.021. New Mexico instead allows a governmental employee

16 to be named in a lawsuit, but it requires the governmental employer to provide a

17 4
 We are unpersuaded by Montaño’s attempt to distinguish the present case from
18 Zavala by claiming that the plaintiffs in that case “made their own free decision to
19 seek medical care in Texas” and that the circumstances of this case did not involve
20 a similarly voluntary decision by Montaño to subject herself to surgery in Texas.

 17
 1 defense and pay damages for the negligence of both current and former employees.

 2 See NMTCA § 41-4-4(B)(1), (C)-(D), (G)-(H).

 3 {29} The two laws have a similar effect. Both provisions are intended to place on

 4 the governmental employer the responsibility for defending and ultimately paying for

 5 lawsuits arising from alleged negligence by governmental employees acting within

 6 the scope of their duties. TTCA Section 101.106(f) is essentially an indemnity

 7 provision because it requires the State of Texas to defend against and pay for any

 8 negligence claims against governmental employees acting within the general scope

 9 of their employment. The TTCA achieves this goal of indemnity by mandating that

10 the governmental entity be named in the suit as the real party in interest. The TTCA

11 does not contain any other indemnity provision. The NMTCA likewise expresses the

12 same policy with respect to defense and indemnification of suits against employees

13 acting within the scope of their duties, with the exception that the NMTCA allows an

14 employee to be named as a nominal defendant despite the governmental unit being

15 the real party in interest. See Teco Invs., Inc. v. Taxation & Revenue Dep’t,

16 1998-NMCA-055, ¶ 12, 125 N.M. 103, 957 P.2d 532 (concluding that when a party

17 has agreed to indemnify another from the liability upon which an action is grounded,

18 the indemnifying party is the real party in interest). Thus, although the laws achieve

 18
 1 the same ends through divergent means, we cannot say that the purpose or effect of

 2 TTCA Section 101.106(f) differs materially from the policies requiring defense and

 3 indemnity of public employees in the NMTCA. See Loucks v. Standard Oil Co. of

 4 N.Y., 120 N.E. 198, 201 (N.Y. 1918) (Cardozo, J.) (“Our own scheme of legislation

 5 may be different. . . . We are not so provincial as to say that every solution of a

 6 problem is wrong because we deal with it otherwise at home.”).

 7 {30} Montaño contends that Texas law should not bar her claims against Dr. Frezza

 8 if TTCA Section 101.106(f) is really just an indemnity provision similar to provisions

 9 in the NMTCA because the State of Texas has already provided a defense for Dr.

10 Frezza. She argues that “Texas could disregard the nominal distinction of having an

11 employee be the named defendant” by not enforcing the TTCA provision. However,

12 that decision ultimately rests with the State of Texas and not this Court. The TTCA

13 represents how the Texas Legislature has chosen to protect that state’s employees and

14 preserve their immunity from suit. Importantly, we cannot say that this choice

15 represents a policy inimical to the NMTCA’s policies.

16 {31} Access to cross-border health care for individuals living in rural parts of New

17 Mexico is an additional consideration that tempers New Mexico’s interest in applying

18 its law to this case. Numerous amici have informed this Court about the relative

 19
 1 shortage of doctors, particularly specialists, in certain rural areas of New Mexico and

 2 the important role that state-operated health care facilities in Texas play in filling

 3 those gaps in care for many residents of the southern and eastern portions of our state.

 4 Could failing to extend comity to Texas in this case diminish the availability of

 5 important medical services to those New Mexico residents? The record before us

 6 here is inadequate, and the arguments are too speculative, for us to draw any

 7 definitive conclusions. However, we do not consider it overly speculative to

 8 conclude that extending comity to Texas in this case will positively serve New

 9 Mexico’s public policy interests by encouraging the continuing cooperation of Texas

10 and New Mexico in maintaining cross-border care networks. See Tarango v.

11 Pastrana, 1980-NMCA-110, ¶ 13, 94 N.M. 727, 616 P.2d 440 (noting that the public

12 interest in maintaining access to cross-border medical services is promoted by

13 applying the law where such services were rendered); see also Wright v. Yackley, 459

14 F.2d 287, 290 (9th Cir. 1972) (“Medical services in particular should not be

15 proscribed by the doctor’s concerns as to where the patient may carry the

16 consequences of his treatment and in what distant lands he may be called upon to

17 defend it.”); Simmons v. State, 670 P.2d 1372, 1385-86 (Mont. 1983) (“Principles of

18 comity, as well as due process, require that we not subject Oregon to the possibility

 20
 1 of lawsuits in every state served by its medical testing facilities. To do otherwise

 2 could conceivably jeopardize the availability of this service.”).

 3 {32} New Mexico’s interest in applying New Mexico law to this case derives from

 4 our public policy of “providing compensation or access to the courts to residents of

 5 the state.” Sam, 2006-NMSC-022, ¶ 26. For example, the purpose of the New

 6 Mexico Medical Malpractice Act, NMSA 1978, §§ 41-5-1 to -29 (1976, as amended

 7 through 2015), is to “promote the health and welfare of the people of New Mexico,”

 8 see § 41-5-2, by ensuring that individuals receive adequate compensation for injuries

 9 caused by medical negligence, see §§ 41-5-1 to -29. Additionally, the NMTCA is

10 designed to circumvent “the inherently unfair and inequitable results which occur in

11 the strict application of the doctrine of sovereign immunity,” § 41-4-2(A), and seeks

12 to hold accountable governmental employees, including physicians, for negligent acts

13 that cause injury, § 41-4-10. These concerns are not negligible. However, as we

14 clarified in Sam, the interest in providing redress to injured New Mexico citizens

15 under our law is “tempered by the concept of comity” and the NMTCA’s public

16 policy goal of limiting the manner in which claims can be brought against the

17 government. 2006-NMSC-022, ¶ 25; see also § 41-4-2(A) (“[I]t is declared to be the

18 public policy of New Mexico that governmental entities and public employees shall

 21
 1 only be liable within the limitations of the [NMTCA].” (emphasis added)).

 2 {33} Further, the New Mexico public policy interests identified in Sam have limited

 3 application here. Sam involved alleged negligence by a New Mexico resident that

 4 caused an accident in New Mexico which harmed another New Mexico resident.

 5 2006-NMSC-022, ¶ 2. Arizona’s interest in the case was ancillary to the allegedly

 6 negligent conduct at the core of that case—the defendant happened to be an Arizona

 7 state employee driving an Arizona-owned vehicle in his official capacity at the time

 8 of the accident. See id.; see also Ramsden v. Illinois, 695 S.W.2d 457, 459 (Mo.

 9 1985) (en banc) (“Illinois did not enter Missouri to conduct an activity, but merely

10 cooperated in a national program to make psychology internships available. . . . The

11 only interest Missouri has in this controversy is the fact that [the plaintiff] lived here

12 when he filed suit.”); cf. Ehrlich-Bober & Co. v. Univ. of Houston, 404 N.E.2d 726,

13 731 (N.Y. 1980) (explaining that the extension of comity was not warranted where

14 the financial transactions at issue in that case were “centered” in the forum state).

15 Accordingly, in Sam we determined that it was appropriate to recognize Arizona’s

16 immunity in a more limited fashion consistent with the contours of New Mexico’s

17 own policy choices after weighing New Mexico’s interests in providing redress to our

18 citizens and regulating negligent conduct within our borders against Arizona’s sole

 22
 1 interest of protecting its sovereign immunity. See 2006-NMSC-022, ¶ 27. By

 2 contrast, this case, much like Wittkowski, Torres, and Zavala, turns upon a Texas state

 3 employee’s acts or omissions that were alleged to have occurred entirely within

 4 Texas. Thus, Texas has a comparatively strong interest in determining the duties and

 5 immunities of that employee and applying a uniform standard of liability to identical

 6 conduct by Texas employees performing their duties in Texas. See Torres, 1995-

 7 NMSC-025, ¶ 14; see also Wittkowski, 1985-NMCA-066, ¶ 8; In re Estate of Gilmore

 8 v. Gilmore, 1997-NMCA-103, ¶ 19, 124 N.M. 119, 946 P.2d 1130 (“The determining

 9 factor [in Torres] was that the police officers involved were New Mexico officers

10 acting in New Mexico, so that New Mexico had a particular interest in the standard

11 of conduct imposed on the officers.”).

12 {34} Our analysis of this factor does not reveal a strong public policy rationale for

13 denying comity to Texas. The substantial public policy interests in applying Texas

14 law to this case are not outweighed by New Mexico’s interest in providing a forum

15 for New Mexicans who seek redress for medical negligence.

16 E. The Fourth Sam Factor: Assessing the Risk of Forum Shopping

17 {35} Under the fourth Sam factor, we measure the degree to which extending

18 immunity to Dr. Frezza in this case under the contours of Texas law would prevent

 23
 1 forum shopping. See 2006-NMSC-022, ¶ 22. Montaño argues that our analysis of

 2 the fourth factor should only examine whether an individual plaintiff has engaged in

 3 improper forum shopping by attempting to bring suit in New Mexico despite having

 4 no basis for doing so. We pause to clarify that there is no indication that Montaño is

 5 engaged in the sort of improper forum shopping that she describes. However, our

 6 inquiry under this factor does not focus on whether a specific plaintiff is forum

 7 shopping, but is instead aimed at whether plaintiffs in general would be encouraged

 8 to bring claims in New Mexico that could not otherwise be brought in Texas. See id.

 9 ¶ 28; see also Newberry v. Ga. Dep’t of Indus. & Trade, 336 S.E.2d 464, 465 (S.C.

10 1985) (concluding that failing to recognize Georgia’s immunity to the extent

11 prescribed under Georgia law would lead to forum shopping because “[a]lthough suit

12 in tort could not be brought in Georgia, a plaintiff could circumvent Georgia’s

13 immunity by bringing suit in this State”). It is self-evident that this factor will always

14 favor extending comity to some extent because uniform application of laws across the

15 states will eliminate the incentive for plaintiffs to bring a cause of action in one state

16 and not another. It is therefore only a question of degree. See, e.g., Sam, 2006-

17 NMSC-022, ¶ 28 (concluding that applying a statute of limitations consistent with the

18 NMTCA rather than Arizona law would “prevent forum shopping to some degree”

 24
 1 but “not completely eliminate [it]”).

 2 {36} With these considerations in mind, we conclude that failing to extend any

 3 immunity to Texas in this case could encourage forum shopping by allowing

 4 plaintiffs to name Texas state employees in lawsuits in New Mexico when plaintiffs

 5 could not do so in Texas. Thus, extending comity to Texas by dismissing Dr. Frezza

 6 from this suit under the TTCA would prevent forum shopping to some degree by

 7 promoting the uniform application of Texas’ waiver of sovereign immunity.

 8 III. CONCLUSION

 9 {37} We have not identified a strong public policy weighing against the presumption

10 of comity in this case. Accordingly, we extend comity to Texas and apply TTCA

11 Section 101.106(f). We reverse the Court of Appeals and the district court. The

12 district court shall dismiss Montaño’s suit without prejudice because Montaño failed

13 to amend her pleadings and name the proper party within thirty days of Dr. Frezza’s

14 motion to dismiss.

15 {38} IT IS SO ORDERED.

16 ______________________________
17 EDWARD L. CHÁVEZ, Justice

 25
1 WE CONCUR:

2 ___________________________________
3 PETRA JIMENEZ MAES, Justice

4 ___________________________________
5 JUDITH K. NAKAMURA, Justice

6 ___________________________________
7 LINDA M. VANZI, Judge
8 Sitting by designation

9 BARBARA J. VIGIL, Justice, concurring in part and dissenting in part

 26
 1 VIGIL, Justice (concurring in part and dissenting in part).

 2 {39} I agree with the majority’s analysis of three out of the four factors of Sam,

 3 2006-NMSC-022, ¶ 22. I write separately to address the third factor, “whether the

 4 forum state has a strong interest in litigating the case.” Id. (emphasis added). New

 5 Mexico has a strong interest in enabling its residents to recover for medical

 6 negligence, particularly those who have limited options. Because my analysis of the

 7 third factor leads me to a different result for this case, I respectfully dissent.

 8 I. COMITY AND THE THIRD FACTOR OF SAM

 9 {40} The majority’s analysis of the interests of Texas under the third factor of Sam

10 departs from the central question of whether extending comity would undermine New

11 Mexico policy. Id. ¶ 21 (“Only if doing so would undermine New Mexico’s own

12 public policy will comity not be extended.”). The third factor requires us to analyze

13 the interests of New Mexico, not the state to be extended comity. See id. ¶ 22.

14 {41} I cannot join the majority’s expansion of the third factor into a balancing test

15 between the interests of New Mexico and its sister state, Texas. See maj. op. ¶ 25

16 (“[I]f the interests of Texas are greater than New Mexico’s, extending comity would

17 not violate our public policy.”). Though the United States Supreme Court historically

18 used a balancing-of-interests approach to resolve similar conflicts of law, it has since

 27
 1 abandoned this approach. See Hyatt, 538 U.S. at 496 (“[W]e abandoned the

 2 balancing-of-interests approach . . . . We thus have held that a State need not

 3 substitute the statutes of other states for its own statutes dealing with a subject matter

 4 concerning which it is competent to legislate.” (internal quotation marks and citations

 5 omitted)). The majority returns to the balancing approach by weighing the interests

 6 of Texas against the interests of New Mexico and goes so far as to suggest that failing

 7 to extend comity will tread upon the sovereignty of Texas. See Hyatt, ___ U.S. at ___,

 8 136 S. Ct. at 1283 (quoting Hyatt, 538 U.S. at 496) (“[W]e need not, and do not,

 9 intend to return to a complex ‘balancing-of-interests approach to conflicts of law

10 under the Full Faith and Credit Clause.’ ”). See maj. op. ¶ 27. The third factor does

11 not require us to determine whether the interests of Texas are greater than New

12 Mexico’s, maj. op. ¶ 25, but rather whether extending comity would serve the

13 interests of New Mexico. Sam, 2006-NMSC-022, ¶¶ 21, 22.

14 {42} The majority’s analysis of the third factor begins with the conclusion that

15 Texas has a strong interest in applying uniform standards of liability and immunity

16 to the conduct of state employees. Maj. op. ¶ 26. While I agree with the majority that

17 Texas could claim an interest in litigating the case, comity requires no such inquiry.

18 See Hyatt, 538 U.S. at 495-96 (abandoning the balancing approach). Moreover, the

 28
 1 majority’s reliance on Wittkowski and Torres is misplaced. See Wittkowski,

 2 1985-NMCA-066, ¶ 8 (holding that “[p]ublic policy dictates that [the forum state]

 3 determine the existence of duties and immunities on the part of [the forum state’s]

 4 officials”); see also Torres, 1995-NMSC-025, ¶ 14 (holding that New Mexico law

 5 should govern the duties of New Mexico law enforcement personnel). Neither of

 6 those cases addresses the central question of the comity analysis: whether applying

 7 the sister state’s law would undermine New Mexico policy. Sam, 2006-NMSC-022,

 8 ¶ 21. For the purposes of deciding whether to extend comity, the strongest source of

 9 New Mexico policy is our legislation itself. See Hyatt, 538 U.S. at 499 (“The Nevada

10 Supreme Court sensitively applied principles of comity . . . relying on the contours

11 of Nevada’s own sovereign immunity from suit as a benchmark for its analysis.”).

12 {43} Our analysis of the third factor cannot begin with the conclusion that Texas

13 sovereignty is at stake. See maj. op. ¶¶ 26-27. Cf. Zavala, 2007-NMCA-149, ¶ 34

14 (describing Texas’s sovereignty interest as a basis for withholding personal

15 jurisdiction over a Texas hospital). Suits against sister states “necessarily implicate[]

16 the power and authority of both sovereigns.” Hyatt, 538 U.S. at 498 (internal

17 quotation marks and citation omitted); see also Hall, 440 U.S. at 416, 426-27

18 (holding that precluding a forum state from applying its own laws “would constitute

 29
 1 the real intrusion on the sovereignty of the States—and the power of the people—in

 2 our Union”).

 3 {44} In sum, the majority’s balancing approach departs from the central question in

 4 Sam: whether extending comity would undermine New Mexico’s interests.

 5 2006-NMSC-022, ¶ 21. Such an approach erodes the sovereignty of New Mexico and

 6 the authority of the New Mexico Legislature. See Hall, 440 U.S. at 426-27; Hyatt,

 7 538 U.S. at 494-95. The proper focus of the third factor is New Mexico’s interests.

 8 Sam, 2006-NMSC-022, ¶¶ 21-22.

 9 II. NEW MEXICO’S INTERESTS IN LITIGATING THE CASE

10 {45} To determine whether New Mexico has a strong interest in litigating the case,

11 we must begin with the presumption that extending comity will not violate New

12 Mexico public policy. Id. ¶ 16; see, e.g., Leszinske, 1990-NMCA-088, ¶ 35 (holding,

13 despite New Mexico’s public policy against incest, that it was not error for the district

14 court to recognize a marriage between an uncle and his niece). Then, we must

15 examine the sister state’s law to see whether it “offends a sufficiently strong public

16 policy to outweigh the purposes served by the rule of comity.” Sam,

17 2006-NMSC-022, ¶ 21 (internal quotation marks and citation omitted). The best

18 estimation of New Mexico’s interests in litigating the case are the policies identified

 30
 1 by the New Mexico Legislature. See Hartford Ins. Co., 2006-NMSC-033, ¶ 8

 2 (describing public policy as the “particular domain of the [L]egislature” (internal

 3 quotation marks and citation omitted)). This requires a comparison of the relevant

 4 provisions of the TTCA with the policies embodied in the NMTCA. See Estate of

 5 Gilmore, 1997-NMCA-103, ¶ 30 (“[I]n assessing a state’s interest in the application

 6 of the law, we cannot assume that the state is result-oriented. We presume that a state

 7 is not interested in the most favorable result for its residents, but only that each state

 8 wants the ‘just’ result for its residents, with justness measured by the laws of that

 9 state.”).

10 {46} The NMTCA and the TTCA are both limited waivers of sovereign immunity.

11 See TTCA § 101.025(a) (“Sovereign immunity to suit is waived and abolished to the

12 extent of liability created by this chapter.”); see also § 41-4-2(A) (“[G]overnmental

13 entities and public employees shall only be liable within the limitations of the Tort

14 Claims Act and in accordance with the principles established in that act.”). Both

15 statutes balance the competing policy goals of limiting government liability and

16 compensating those who are injured by government employees. Frezza, 2015-

17 NMCA-069, ¶¶ 33-34. In light of these shared objectives, not every aspect of the

18 TTCA will be incompatible with the NMTCA. However, when “[a] comparison of the

 31
 1 NMTCA and the TTCA reveals that the balance struck by the New Mexico

 2 Legislature is substantively different from that struck by Texas legislators,” Frezza,

 3 2015-NMCA-069, ¶ 34, New Mexico has a strong interest in litigating the case. See

 4 Hyatt, ___ U.S. at ___, 136 S. Ct. at 1281 (stating that a state is not required “to

 5 substitute for its own statute . . . the statute of another State reflecting a conflicting

 6 and opposed policy.” (internal quotation marks and citation omitted)).

 7 {47} New Mexico has a strong interest in applying its own waiver of sovereign

 8 immunity, which is significantly broader than that of Texas. See § 41-4-10; see also

 9 TTCA § 101.021. In Hyatt, the United States Supreme Court affirmed the Nevada

10 Supreme Court’s decision to apply Nevada’s broader waiver of immunity to an

11 intentional tort claim against California. 538 U.S. at 494-95; see id. at 494 (holding

12 that Nevada was “undoubtedly ‘competent to legislate’ with respect to the subject

13 matter of the alleged intentional torts here, which, it [was] claimed, [had] injured one

14 of its citizens within its borders”). The New Mexico Legislature has chosen to waive

15 immunity for the negligence of public employees acting within the scope of their

16 duties of providing health services. Section 41-4-10. In contrast, in the medical

17 malpractice context, the Texas waiver applies only in cases where the harm was

18 caused by the misuse of tangible personal property. See TTCA § 101.021(2); see also

 32
 1 Tex. Tech. Univ. Health Sci. Ctr. v. Jackson, 354 S.W.3d 879, 884 (Tex. App. 2011)

 2 (“A plaintiff must show that the tangible personal property was the instrumentality

 3 of harm.” (citations omitted)). The Texas waiver does not extend to claims alleging

 4 lack of informed consent, Kamel v. Univ. of Tex. Health Sci. Ctr. at Hous., 333

 5 S.W.3d 676, 686 (Tex. App. 2010), or errors in medical judgment. See Miers v. Tex.

 6 A & M Univ. Sys. Health Sci. Ctr., 311 S.W.3d 577, 579-80 (Tex. App. 2009)

 7 (holding that a dentist’s negligent decision to pull teeth did not fall under the waiver

 8 because he correctly used the instruments to remove them). Applying the TTCA’s

 9 more limited waiver would undermine New Mexico’s strong policy of waiving

10 immunity for the negligence of public employees. See Sam, 2006-NMSC-022, ¶ 21.

11 {48} Likewise, New Mexico has a strong interest in applying its own notice

12 provisions, which are more lenient than those of Texas. See § 41-4-16(A); see also

13 TTCA § 101.101(a), (c). Texas requires the plaintiff to give notice of the claim no

14 later than six months after the date of the incident giving rise to the claim. See TTCA

15 § 101.101(a). While the NMTCA requires the plaintiff to give notice of the suit

16 within ninety days and is technically stricter on its face, see § 41-4-16(A), the

17 statutory period is tolled until the plaintiff knows or with reasonable diligence should

18 have known of the injury and its cause. Maestas v. Zager, 2007-NMSC-003, ¶ 22, 141

 33
 1 N.M. 154, 152 P.3d 141. By contrast, the “discovery rule” does not apply to the

 2 TTCA. See Timmons v. Univ. Med. Ctr., 331 S.W.3d 840, 842-43, 847-48 (Tex. App.

 3 2011). Texas’s notice requirement has a harsher effect than New Mexico’s. See id.

 4 The harsher notice requirement is sufficiently offensive to New Mexico public policy

 5 to overcome the presumption of comity. See Sam, 2006-NMSC-022, ¶ 27 (declining

 6 to recognize Arizona’s harsher statute of limitations).

 7 {49} I agree with the majority that there is no material difference between the

 8 TTCA’s prohibition of suits against individual employees and the NMTCA, which

 9 permits suits against an individual but requires the government to defend and pay

10 damages for the individual’s negligence. Compare TTCA § 101.026 (“To the extent

11 an employee has individual immunity from a tort claim for damages, it is not affected

12 by this chapter.”), and TTCA § 101.102(b) (“The pleadings of the suit must name as

13 defendant the governmental unit against which liability is to be established.”), with

14 Section 41-4-4(B)(1) (requiring the governmental entity to provide a defense,

15 including costs and attorneys fees, for any tort committed by an employee acting

16 within the scope of duty). I would therefore recognize these provisions in the spirit

17 of comity. However, I would decline to extend comity to the harsh procedural

18 mechanism at issue in this case. See TTCA § 101.106(f). TTCA Section 101.106(f)

 34
 1 dictates mandatory dismissal, on the employee’s motion, of a suit filed against the

 2 individual employee unless the plaintiff amends the pleading within thirty days. There

 3 is no similar provision in the NMTCA, and applying the Texas provision would

 4 frustrate New Mexico’s strong interest in providing compensation and access to the

 5 courts to the residents of our state. See Sam, 2006-NMSC-022, ¶ 26. This concern is

 6 heightened given the lack of options Ms. Montaño had to pursue surgery in New

 7 Mexico. Applying TTCA § 101.106(f) undermines New Mexico’s policy in this case.

 8 {50} I would decline to extend comity to those provisions of the TTCA which

 9 undermine New Mexico policy. See Sam, 2006-NMSC-022, ¶ 21. Instead, I would

10 recognize Texas law to the extent consistent with the NMTCA. Cf. Hyatt, ___ U.S.

11 at ___, 136 S. Ct. at 1282-83 (holding that Nevada adopted an unconstitutional policy

12 of hostility toward the sister state when it awarded damages inconsistent with the

13 general principles of Nevada immunity law).

14 III. OTHER POLICY CONSIDERATIONS

15 {51} I agree with the majority that maintaining access to Texas medical facilities is

16 of utmost importance to New Mexicans who, like Ms. Montaño, depend on Texas

17 providers for medical treatment. Maj. op. ¶ 31. However, without evidence of the

18 potential impact that declining to extend comity would have on New Mexicans’

 35
 1 access to care, I cannot conclude that it would be contrary to public policy to apply

 2 the very laws enacted to protect New Mexicans who are victims of medical

 3 negligence.

 4 {52} Other courts have distinguished the interest in ensuring redress for medical

 5 malpractice from the interest in maintaining the availability of medical services. See

 6 Simmons, 670 P.2d at 1383-84. In Simmons, the Supreme Court of Montana declined

 7 to exercise jurisdiction over an Oregon state medical laboratory as a matter of comity.

 8 Id. at 1386. As in this case, the state laboratory was performing a regional medical

 9 service within its own boundaries and the two states had a shared interest in medical

10 testing technology. Id. at 1385-86. The Court held that declining to extend comity

11 could conceivably jeopardize the availability of interstate medical testing. Id.

12 However, the Court declined to extend its holding to cases involving medical

13 malpractice, recognizing that “[j]ustice undeniably would be defeated if the refusal

14 to assert jurisdiction would insulate Oregon from any malpractice claims.” Id. at

15 1384. By this reasoning, the interest in access to care does not overcome New

16 Mexico’s interests in litigating the case.

17 IV. CONCLUSION

18 {53} Comity does not demand that the forum state abandon its important interests

 36
 1 in favor of the sister state’s. See Sam, 2006-NMSC-022, ¶ 16 (“[I]n order to refuse

 2 to honor the laws of another state, a forum state only needs to declare that the other

 3 state’s law would violate its own legitimate public policy.”). Rather, it encourages the

 4 forum state to accommodate any competing interests without abdicating its own. The

 5 majority’s deference to the interests of Texas shifts the comity analysis away from the

 6 overarching issue of whether extending comity would undermine New Mexico public

 7 policy. Id. ¶ 21. When extending comity would undermine the policy embodied in the

 8 NMTCA, see id. ¶ 21, New Mexico has a strong interest in litigating the case.

 9 {54} For these reasons, I respectfully dissent in part.

10 ______________________________
11 BARBARA J. VIGIL, Justice

 37